PEGGY SUE JOLLY, PETITIONER v. J. WILBURN QUEEN AND WIFE, PEARL H. QUEEN, RESPONDENTS.

(Filed 18 June, 1965.)

**1. Bastards § 11—**

The putative father of an illegitimate child may defeat the right of the child's mother to its custody only by showing that the child's mother, by reason of bad character or special circumstances, is unfit to have its custody, and that therefore the welfare of the child overrides her paramount right to custody.

**2. Same—**

Where the court finds that the mother of an illegitimate child is a fit and suitable person and is capable of taking care of her child, it may not enter an order awarding custody to the child's father, even upon finding that such award is to the best interest of the child, there being no findings to justify a conclusion that the mother had forfeited her paramount right.

APPEAL by petitioner from *Froneberger, J.,* in Chambers in HENDERSON on October 19, 1964.

This special proceeding, instituted under G.S. 50-13 on August 11, 1964, in McDowell County, is to determine the custody of James William Piercy, sometimes known as James William Queen, the illegitimate child of petitioner and male respondent (Queen).

To detail the evidence in the case would ill serve the child in question. The rudimentary facts are these: The relationship between petitioner and Queen began in the summer of 1954, when petitioner, 17 years old, was employed by Queen, approximately 45, to work for him at his skating rink in Old Fort. Queen was then living with his wife, *feme* respondent (Mrs. Queen), as he is now. In the fall of 1956 petitioner conceived Queen's child, James William Piercy. When petitioner refused to have an abortion, Queen took her to Florida, to conceal her condition from her family and his wife. They lived together there both before and after the child was born on May 11, 1957. In May 1959 petitioner ended the relationship and returned to her mother's home in Old Fort. Shortly thereafter petitioner became seriously ill and was hospitalized at intervals over a five-month period. During her illness Queen began visiting the child in the home of petitioner's parents. Soon he was taking the child to his home to spend the night and, later, weekends.

On October 15, 1960, petitioner married M. N. Jolly, who had full knowledge of her past. On that day, according to petitioner, she agreed with Mrs. Queen that she would leave the child in the Queen home and "give it a try." According to Mrs. Queen, petitioner "gave" the child to her and Queen and promised "to sign legal papers." From time to time thereafter the Queens requested petitioner to sign a consent to their adoption of the child, but this she never did.

After their marriage petitioner and her husband moved to Cabarrus County, where he was employed, but at least once a month she returned to visit the child. He spent Thanksgiving with her, and, when she visited in Old Fort, he spent the days with her. In November 1961 petitioner and her husband moved to Marion. Thereafter, petitioner's evidence tends to show, the boy spent at least one day a week with her. She visited him 2-3 times a week and took him wherever she wished.

On August 28, 1963, a son was born to petitioner and her husband.

In June 1964, according to petitioner, the child signified a desire to spend more time with her. Queen then objected to her seeing the child at all. Whereupon, she decided that the child's best interest required her to take him back into her custody. After consulting an attorney, who advised her that she had the legal right to do so, petitioner did take the child from Mr. and Mrs. Queen in July 1964. With the boy and her brother, petitioner set out on a vacation motor trip to the West Coast. On July 30, 1964, Queen suffered a serious heart attack and was hos-

pitalized. Mrs. Queen requested petitioner to return to McDowell County with the child so that he could comfort his father. Consequently, petitioner returned and delivered the boy to Mrs. Queen with the understanding that he would be re-delivered to her the following morning. When petitioner went for him, however, Mrs. Queen refused to surrender him. This proceeding resulted.

Petitioner is now approximately 28 years old. Her husband is a college graduate. As manager of a finance company in Marion he has an average annual income of $7,600.00. He has expressed the desire to rear the child. Petitioner's evidence and the report of the McDowell Welfare Department show petitioner and her husband to have a stable home and a good house.

Queen is now approximately 56 years old and, at the time of the hearing, was still confined to his home on account of the heart attack. He is a plumber and owns a septic-tank company. Mrs. Queen is about the same age as her husband and holds a responsible position in the office of a nearby hosiery mill. Her maiden sister lives in the home and helps care for the child. The Queens own a comfortable dwelling in Old Fort with about eight acres of ground surrounding it. It is larger and more expensive than that of petitioner and her husband. Respondents' evidence and the report of the Welfare Department show them to have a stable home life and the respect of the community and fellow church members, and the child to be happy and well adjusted with them, and to be a good student.

After a lengthy hearing Judge Froneberger found as a fact that both petitioner and male respondent and their respective spouses are now persons of good character and fit and suitable persons to have the care and custody of the child; that it is in his best interest that his custody be awarded to the Queens for the nine months of the school year and to petitioner for the other three months, with specified visitation privileges to each during the interval custody is in the other. From the order entered upon these findings, petitioner appeals, assigning error in the award of custody to the Queens and the findings upon which it was based.

*Paul J. Story for petitioner, appellant.*
*Walter C. Benson for respondents, appellees.*

SHARP, J. "It is well settled law in this State, and it seems to be universally so held, that the mother of an illegitimate child is its natural guardian, and, as such, has the legal right to its custody, care and control, if a suitable person, even though others may offer more material advantages in life for the child," *Browning v. Humphrey,* 241

N.C. 285, 287, 84 S.E. 2d 917, 918; *accord, Wall v. Hardee,* 240 N.C. 465, 82 S.E. 2d 370; *In re Cranford,* 231 N.C. 91, 56 S.E. 2d 35; *In re McGraw,* 228 N.C. 46, 44 S.E. 2d 349; *In re Foster,* 209 N.C. 489, 183 S.E. 744; *In re Shelton,* 203 N.C. 75, 164 S.E. 332; *In re Jones,* 153 N.C. 312, 69 S.E. 217; 10 Am. Jur. 2d, Bastards § 60 (1963); 3 Lee, North Carolina Family Law § 224 (3d Ed. 1963).

> "At common law the right to the custody of legitimate children was generally held to be in the father, but as to illegitimate children the rule was different. As between the putative father and the mother of illegitimate children, it is well established that the mother's right of custody is superior, and the father's right, if any such exists, is secondary." Annot., Right of mother to custody of illegitimate child, 98 A.L.R. 2d 417, 431, citing cases from 20 jurisdictions, including North Carolina.

As against the right of the mother of an illegitimate child to its custody, the putative father may defend only on the ground that the mother, by reason of character or special circumstances, is unfit or unable to have the care of her child and that, for this reason, the welfare, or best interest, of the child overrides her paramount right to custody. In *Dellinger v. Bollinger,* 242 N.C. 696, 89 S.E. 2d 592, this Court held that the putative father of an illegitimate child, even though his right to custody is not primary, has such an interest in the welfare of his child that he can bring a proceeding against the mother under G.S. 50-13 for its custody. After overruling the mother's demurrer to the father's petition, and without giving her an opportunity to answer, the judge awarded the father custody on the basis of his affidavits (a reference to the record shows) that the mother was abusing, mistreating, and starving the 3-year-old child. This court treated the order as awarding custody *pendente lite* only and remanded the case so that the mother might answer the petition and offer her evidence.

*In re McGraw, supra,* decided prior to the 1949 amendment to G.S. 50-13 (see *In re Cranford, supra*), the putative father, alleging facts which would support the jurisdiction of the Juvenile Court, sued out a *habeas corpus* to take custody of the child from its mother. He based his claim upon an alleged superior right in himself, as father, to the custody of his child. This Court, quoting from *In re Shelton, supra,* and *In re Jones, supra,* regarding the *prima facie* right of the mother to custody, dismissed his appeal from an adverse judgment, saying, *per* Seawell, J.:

> "It is easy to see why the policy of the law, in its development from both circumstance and necessity, has not thus far conferred

the superior right of custody on the non-legitimate father of a bastard child, at least while the latter remains *nullius filius.* We have not been presented with convincing authority to sustain the jurisdiction of the Superior Court in behalf of the petitioner; and we do not feel that the exigency of decision requires us to discuss that of the Juvenile Court." *Id.* at 47, 44 S.E. 2d at 350.

In this case Queen has taken no steps to legitimate the son whose custody he now claims. Gen. Stats., ch. 49, art. II. Therefore, under our intestacy laws, the child cannot inherit from his father or his father's relatives. Should Queen die, Mrs. Queen, of course, would have no legal obligation to the boy. The child and his lineal descendants can take "by, through and from his mother and his other maternal kindred, both descendants and collaterals, and they are entitled to take from him." G.S. 29-19; 3 Lee, *op. cit. supra* § 252. Should petitioner and her husband desire that he adopt the boy, Queen's consent would be unnecessary. G.S. 48-6(a) ; *In re Adoption of Doe,* 231 N.C. 1, 9, 56 S.E. 2d 8, 13. The child's domicile is that of his mother, petitioner. *In re Blalock,* 233 N.C. 493, 64 S.E. 2d 848; *Thayer v. Thayer,* 187 N.C. 573, 122 S.E. 307; 3 Lee, *op. cit. supra* § 227. The only legal right which the boy can enforce against his putative father is provided by Gen. Stats., ch. 49, art. I. *(Bastardy).* But this article is not primarily to benefit illegitimate children but to prevent them from becoming public charges. *Allen v. Hunnicutt,* 230 N.C. 49, 52 S.E. 2d 18.

In the face of all this, it would be anomalous indeed if the law should sanction an award of custody to the putative father when there is a specific finding that the mother "is now of good character and reputation and is a fit and suitable person to have the custody of minor children and is a fit and proper person to have custody of the said James William Piercy (sometimes known as James William Queen)." On this finding establishing her fitness, and the additional finding establishing that of her husband, the award of custody to the putative father, Queen, cannot be sustained. *In re Cranford, supra.* The mother being of good character and able to provide for her child, the finding of the judge that it is in the best interest of the child that he remain in the home of respondents for nine months during the year is not controlling. *In re Shelton, supra.* Conceivably, a judge might find it to be in the best interest of a legitimate child of poor but honest, industrious parents, who were providing him with the necessities, that his custody be given to a more affluent neighbor or relative who had no child and desired him. Such a finding, however, could not confer a right as against such parents who had not abandoned their child, even though they had permitted him to spend much time in the neighbor's home. In other

words, the parents' paramount right to custody would yield only to a finding that they were unfit custodians because of bad character or other, special circumstances. So it is with the paramount right of an illegitimate's mother.

The judgment here contains no finding of fact which would justify the conclusion that petitioner has forfeited her paramount right to the custody and control of the child. If he is eventually to live with his mother, his step-father, and his half-brother, the time to begin is now. Under the law as applied to the findings in this case, petitioner is entitled to the exclusive custody of her child, James William Piercy, and we so hold.

The judgment of the court below is

Reversed.