DANIEL FABRICIO ROSERO v. LISA BLAKE

No. 322A02

(Filed 13 June 2003)

## Child Custody, Support, and Visitation— custody—illegitimate child—common law presumption abrogated

The trial court did not err by awarding custody of an illegitimate child to plaintiff father based on the best interest of the child standard, because the common law rule that custody of an illegitimate child presumptively vests in the mother has been abrogated by changes in statutory law, including that: (1) N.C.G.S. § 50-13.2(a) provides that absent a showing that the biological or adoptive parents are unfit, that they have otherwise neglected their children's welfare, or that some other compelling reason exists, the paramount rights of both parents to the companionship, custody, or care and control of their minor child must prevail; (2) N.C.G.S. § 29-19(b)(2) and (c) provides that illegitimate children today are entitled to inherit from their fathers and his relatives, and the fathers would be entitled to inherit from their children, even though they have not been legitimated; (3) N.C.G.S. § 48-3-601(2)(b) provides that the consent of illegitimate children's fathers who acknowledged paternity is required for their adoption; and (4) N.C.G.S. § 110-132(a) provides another method for formal acknowledgment of paternity even though the father may not have pursued legitimation procedures.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 150 N.C. App. 250, 563 S.E.2d 248 (2002), reversing and remanding an order for permanent custody entered 2 January 2001, *nunc pro tunc* 12 December 2000, by Judge Anne Salisbury in District Court, Wake County. On 15 August 2002, the Supreme Court allowed plaintiff's petition for discretionary review of additional issues. Heard in the Supreme Court 10 March 2003.

*Kathleen Murphy for plaintiff-appellant.*

*Sally H. Scherer for defendant-appellee.*

*The Sandlin Law Firm, by Deborah Sandlin, on behalf of the North Carolina Academy of Trial Attorneys, amicus curiae.*

**ROSERO v. BLAKE**

[357 N.C. 193 (2003)]

BRADY, Justice.

The questions presented for review are whether the North Carolina common-law rule that custody of an illegitimate child presumptively vests in the mother has been abrogated by statutory and case law and whether that presumption violates the federal and state Constitutions. We conclude that the common-law rule has been abrogated by statute, and accordingly, we reverse the decision of the Court of Appeals.

The parties to this action are the natural parents of Kayla Alexandria Rosero, born 20 March 1996. Following brief sexual encounters between the parties in 1995, plaintiff, Kayla's father, moved to the state of Oklahoma, where he resided at the time of Kayla's birth. Kayla's mother, defendant, resided at all times in North Carolina with Kayla and Kayla's two older, half brothers. The parties were never married to each other.

Upon being informed of Kayla's birth, first by defendant and then by the Wake County Child Support Enforcement Agency, plaintiff submitted to a blood test, which proved that he was Kayla's father. Plaintiff acknowledged paternity on 3 March 1997 by signing a "Father's Acknowledgment of Paternity" prepared pursuant to N.C.G.S. § 110-132(a), and an "Order of Paternity" was subsequently entered pursuant to the acknowledgment. Plaintiff agreed to and began providing support for Kayla without a court order. Plaintiff has never legitimated Kayla pursuant to N.C.G.S. § 49-10 or sought a judicial determination of paternity as provided for in N.C.G.S. § 49-14.

Kayla continued to reside with defendant in North Carolina but visited regularly with plaintiff and his wife in Oklahoma. Defendant maintained a relationship with Clea Johnson, the father of her other children, and Kayla also became close to Johnson, calling him "daddy Clea." Defendant worked rotating shifts at a local medical facility, and as a result, Kayla often spent nights and weekends with defendant's mother and grandmother. Defendant's mother worked at the day care attended by Kayla.

Kayla's visits with her father in Oklahoma consisted of long weekends. Defendant flew with Kayla to meet plaintiff in Oklahoma, facilitating the minor child's visits with her father. On three or four occasions, Kayla visited with her father two weeks at a time. Plaintiff also visited Kayla in North Carolina and kept in contact with her through telephone calls and other correspondence.

ROSERO v. BLAKE

[357 N.C. 193 (2003)]

On 22 March 2000, shortly after Kayla's fourth birthday, plaintiff initiated the present action for primary custody of his minor child, alleging that awarding him custody was in her best interest. Defendant answered plaintiff's allegations and filed a counterclaim for primary custody. According to defendant, she should retain primary custody, as it is in Kayla's best interest to remain in North Carolina and in the environment to which she had become accustomed. Four and one-half months after initiating the custody proceeding, but prior to a hearing, plaintiff and his wife moved to North Carolina and continued regular visits with the child.

Upon hearing testimony and arguments from both parties, the trial court awarded primary custody to plaintiff. In an order entered 2 January 2001, signed *nunc pro tunc* 12 December 2000, the court concluded that, although both parents were fit and proper, it was in Kayla's best interest that she be placed in plaintiff's primary custody. The court found support in its conclusion in the stable and structured life provided by plaintiff and his wife, a person with whom Kayla had developed a loving relationship. The trial court noted that, in contrast to the environment created by plaintiff, defendant's social life and work schedule created a "hectic household" that did not meet the child's needs for stability and consistency. Defendant appealed the order for permanent custody.

During the pendency of defendant's appeal, plaintiff took physical custody of Kayla, and in turn, defendant filed a motion for a protective order with the trial court. The trial court denied the motion for a protective order.

On 21 May 2002, a divided panel of the Court of Appeals reversed the trial court's order awarding custody to plaintiff and remanded the case for a new hearing consistent with its opinion. *Rosero v. Blake*, 150 N.C. App. 250, 563 S.E.2d 248 (2002). The Court of Appeals began by concluding that the trial court did not err in refusing to grant the protective order. *Id.* at 254, 563 S.E.2d at 251. Relevant to our review, the Court of Appeals further concluded that, in awarding custody to plaintiff based upon what was in Kayla's best interest, the trial court ignored the common-law presumption that custody of an illegitimate child should be awarded to the mother, absent a showing that she is unfit or otherwise unable to care for the minor child. *Id.* at 260, 563 S.E.2d at 255. Judge Ralph Walker concurred in part and dissented in part with a separate opinion. Judge Walker found no error in the trial court's application of the best interest of the child standard because it was his belief that the common-law presumption in favor of the

mother had been abrogated by statute. *Id.* at 262, 563 S.E.2d at 256 (Walker, J., concurring in part and dissenting in part). Judge Walker also concluded that the case should be remanded for more detailed findings, as the trial court's findings were not supported by competent evidence. *Id.* at 266, 563 S.E.2d at 258 (Walker, J., concurring in part and dissenting in part).

The case is now before this Court pursuant to plaintiff's appeal of right based upon Judge Walker's dissent and plaintiff's petition for discretionary review of an additional issue allowed by this Court.

We find it appropriate to begin with a brief background into the common-law presumption giving rise to plaintiff's appeal. Under early North Carolina common law, an illegitimate child was *nullius filius*, meaning that the child had "no father known to the law, no distinction being made between a reputed father and an admitted father." *Allen v. Hunnicutt*, 230 N.C. 49, 50, 52 S.E.2d 18, 19 (1949). Thus, custody of an illegitimate child was to be presumptively awarded to the mother unless she was deemed unsuitable. *See, e.g., Jolly v. Queen*, 264 N.C. 711, 713, 142 S.E.2d 592, 595 (1965); *Browning v. Humphrey*, 241 N.C. 285, 287, 84 S.E.2d 917, 918-19 (1954); *In re Shelton*, 203 N.C. 75, 79, 164 S.E. 332, 334 (1932). This well-established presumption in favor of the child's mother could be rebutted by the putative father only if he proved that "the mother, by reason of character or special circumstances, is unfit or unable to have the care of her child and that, for this reason, the welfare, or best interest, of the child overrides [the mother's] paramount right to custody." *Jolly*, 264 N.C. at 714, 142 S.E.2d at 595. The presumption dates back to pre-America England, where "[b]etween the father and the mother . . . , the latter seems to have the prior claim; for if the father obtain[ed] the custody surreptitiously, the king's bench w[ould] make him restore it." *Moritz v. Garnhart*, 7 Watts 302, 303 (Pa. 1838) (citation omitted). The mother's paramount right to custody was based upon the "frequent doubt as to the child's father, and [the fact] that the mother, nearest in interest and affection to the child, w[ould] best promote its welfare." *Wall v. Hardee*, 240 N.C. 465, 466, 82 S.E.2d 370, 372 (1954); *see also Moritz*, 7 Watts at 303 ("Though [a child born out of wedlock] be not looked upon as a child for any civil purpose, the ties of nature are respected in regard to its maintenance.").

The North Carolina General Statutes provide that common law, "which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete, [is] hereby declared to be

ROSERO v. BLAKE

[357 N.C. 193 (2003)]

in full force within this [s]tate." N.C.G.S. § 4-1 (2001) (last amended in 1778). Thus, because the common-law presumption recognizing a preference for maternal custody of an illegitimate child had not been abrogated, a putative father was on unequal footing with the mother unless he had the child statutorily legitimated either through a legitimacy proceeding as provided for by N.C.G.S. § 49-10 or through subsequent marriage to the child's mother pursuant to N.C.G.S. § 49-12. *See* N.C.G.S. § 49-11 (2001) ("The effect of legitimation . . . shall be to impose upon the father and mother all of the lawful parental privileges and rights, as well as all of the obligations which parents owe to their lawful issue, and to the same extent as if said child had been born in wedlock . . . .").

In 1955, this Court held that a putative father was a "parent" as defined by North Carolina's general custody statute in effect at that time, N.C.G.S. § 50-13 (1950) (repealed 1967), and therefore had a right to maintain an action for custody of his illegitimate child under that statute.[1] *Dellinger v. Bollinger*, 242 N.C. 696, 699, 89 S.E.2d 592, 594 (1955) ("Certainly [N.C.G.S. § 50-13] is sufficiently broad and comprehensive to include this proceeding which is a controversy respecting the custody of a child."). Although a putative father could *maintain* an action for custody under N.C.G.S. § 50-13, this Court confirmed, as late as 1965, that to be awarded custody, the putative father must still overcome the common-law presumption for awarding custody in favor of the mother. In *Jolly v. Queen*, 264 N.C. 711, 142 S.E.2d 592 (1965), a mother sought to retain custody of her illegitimate child under circumstances remarkably similar to those existing in the present case. The father in *Jolly* had held his illegitimate child out as his son, had cared for the child, and had provided for him. However, the father failed to have the child legitimated.

This Court reversed the trial court's award of custody to the putative father based upon the trial court's finding that such an award was in the child's best interest. *Id.* at 716, 142 S.E.2d at 596. In so doing, this Court referenced the maternal-preference presumption, noting

---

1. N.C.G.S. § 50-13 provided for a custody proceeding pursuant to a divorce. In 1949, the General Assembly amended the statute to include not only custody actions arising out of divorce proceedings, but also "controversies respecting the custody of children not provided for by . . . G.S. 17-39." Act of Apr. 15, 1949, ch. 1010, sec. 1, 1949 N.C. Sess. Laws 1148, 1148. N.C.G.S. § 17-39, as found in the 1953 edition of our General Statutes, provided *habeas corpus* relief to determine custody where husband and wife were living separate and apart. 3 Robert E. Lee, *North Carolina Family Law* § 222 (3d ed. 1963) [hereinafter Lee's *Family Law*]. Both N.C.G.S. § 17-39 and § 50-13 were repealed in 1967. Act of July 6, 1967, ch. 1153, sec. 1, 1967 N.C. Sess. Laws 1772, 1772.

ROSERO v. BLAKE

[357 N.C. 193 (2003)]

that when confronted with a similar situation in the past, the Court was not " 'presented with convincing authority' " to sustain a trial court's conclusion that the best interest of an illegitimate child would be served by placing it with the father. *Id.* at 715, 142 S.E.2d at 595 (quoting *In re Care & Custody of McGraw*, 228 N.C. 46, 47, 44 S.E.2d 349, 350 (1947)). The Court went on to emphasize the following:

> In this case [the putative father] has taken no steps to legitimate the son whose custody he now claims. Therefore, under our intestacy laws, the child cannot inherit from his father or his father's relatives. Should [the putative father] die, [his wife], of course, would have no legal obligation to the boy. The child and his lineal descendants can take "by, through and from his mother and his other maternal kindred, both descendants and collaterals, and they are entitled to take from him." G.S. 29-19. Should [the mother] and her husband desire that he adopt the [child], [the father's] consent would be unnecessary. The child's domicile is that of his mother . . . . The only legal right which the boy can enforce against his putative father is provided by Gen. Stats., ch. 49, art. I.[2] But this article is not primarily to benefit illegitimate children but to prevent them from becoming public charges.

*Jolly*, 264 N.C. at 715, 142 S.E.2d at 595-96 (citations omitted).

The Court in *Jolly* envisioned a derogation to parents' paramount right to custody of their children by sustaining a finding that the *Jolly* child's best interest would be served by placing him with his father, a person with whom the child had no legal relationship. According to the Court,

> a judge might find it to be in the best interest of a legitimate child of poor but honest, industrious parents, who were providing him with the necessities, that his custody be given to a more affluent neighbor or relative who had no child and desired him. Such a

---

2. At the time this Court decided *Jolly*, N.C.G.S. §§ 49-1 to -9 provided the exclusive remedy for collecting financial support for an illegitimate child. Pursuant to sections 49-1 to -9, a criminal action could be brought in the name of the state against a reputed father for his willful negligence to support his illegitimate child. 2 Lee's *Family Law* § 177. Violation of the statute was punishable as a misdemeanor, and, upon finding a violation, the judge was to set an amount of support to be paid by the father. *Id.* Any benefit to the child was incidental to the statute's purpose, which was to prevent illegitimate children "from becoming public charges." *Allen*, 230 N.C. at 51, 52 S.E.2d at 19. Those same provisions, with subsequent modifications, still govern criminal actions for nonsupport of illegitimate children today. *See* N.C.G.S. § 49-1 to -9 (2001).

finding, however, could not confer a right as against such parents who had not abandoned their child, even though they had permitted him to spend much time in the neighbor's home. In other words, the parents' paramount right to custody would yield only to a finding that they were unfit custodians because of bad character or other, special circumstances. So it is with the paramount right of an illegitimate[ child's] mother.

*Id.* at 715-16, 142 S.E.2d at 596.

It is against this background that we consider the dispositive issue for which plaintiff appealed of right to this Court: Whether the North Carolina common-law rule that custody of an illegitimate child presumptively vests in the mother has been abrogated by statutory and case law. Concluding that the presumption no longer exists as law in this state, we reverse the Court of Appeals' decision to the contrary for the reasons stated below.

There is no question that the landscape of our law governing child custody, the rights of unwed fathers, and the rights of illegitimate children changed dramatically beginning shortly after our 1965 decision in *Jolly*. In 1967, our General Assembly repealed all prior statutes governing the custody of minor children and enacted N.C.G.S. § 50-13.1 to -13.8, a statutory scheme under which all child custody actions are now to be brought. Ch. 1153, secs. 1-2, 1967 N.C. Sess. Laws at 1772-77; *see also Oxendine v. Catawba Cty. Dep't of Soc. Servs.*, 303 N.C. 699, 706, 281 S.E.2d 370, 374 (1981) (noting that although section 50-13.1 is contained within that portion of our General Statutes governing divorce and alimony, its application was not to be restricted to custody disputes within the context of separation or divorce). N.C.G.S. §§ 50-13.1 to -13.8 were enacted "to eliminate conflicting and inconsistent custody statutes and to replace them with a comprehensive act governing all custody disputes." *Oxendine*, 303 N.C. at 706, 281 S.E.2d at 374. When enacted, N.C.G.S. § 50-13.2 directed the trial courts to award custody based upon what "will best promote the interest and welfare of the child." Ch. 1153, sec. 2, 1967 N.C. Sess. Laws at 1772 (adopting the text still contained in N.C.G.S. § 50-13.2(a), (b)). Significant to our discussion here, the legislature further amended N.C.G.S. § 50-13.2 in 1977 to provide: "[B]etween the mother and father, whether natural or adoptive, there is no presumption as to who will . . . better promote the interest and welfare of the child." Act of June 8, 1977, ch. 501, sec. 2, 1977 N.C. Sess. Laws 582, 582-83 (amending subsection 50-13.2(a)) (The relevant portion of the current version of the statute provides the fol-

lowing: "Between the mother and father, whether natural or adoptive, no presumption shall apply as to who will better promote the interest and welfare of the child.").

During the same year that the General Assembly enacted N.C.G.S. §§ 50-13.1 to -13.8, it adopted N.C.G.S. §§ 49-14, -15, and -16, abrogating common law to allow an illegitimate child's father to bring a judicial action establishing paternity. 3 Robert E. Lee, *North Carolina Family Law* § 251 (Supp. 1976). N.C.G.S. § 49-15, which has not been amended since its enactment in 1967, provides as follows:

> Upon and after the establishment of paternity of an illegitimate child pursuant to G.S. 49-14, the rights, duties, and obligations of the mother and the father so established, with regard to support and custody of the child, shall be the same, and may be determined and enforced in the same manner, as if the child were the legitimate child of such father and mother.

N.C.G.S. § 49-15 (2001).

Soon after the enactment of and subsequent modifications to sections 50-13.1 to -13.8 and sections 49-14 to -16, our appellate courts acknowledged the legal consequences that followed therefrom. Notably, a 1974 decision by the Court of Appeals indicated that the common-law presumption for awarding custody of illegitimate children to their mothers had been abrogated. In *Conley v. Johnson*, 24 N.C. App. 122, 210 S.E.2d 88 (1974), the Court of Appeals affirmed a trial court's award of visitation of an illegitimate child to her father based upon what was in the child's best interest. The trial court in *Conley* found that the plaintiff, who alleged that he was the child's father and had been previously ordered to pay child support in criminal court, was indeed the child's father and was "a fit, suitable and proper person to have reasonable visitation privileges." *Id.* at 123, 210 S.E.2d at 89. The mother appealed.

The Court of Appeals in *Conley* acknowledged that the mother's challenge to the trial court's award of visitation was based upon common law that dictated that an illegitimate child's father was not entitled to visitation unless visitation was consented to by the mother. *Id.* The court, however, citing *Dellinger*, 242 N.C. 696, 89 S.E.2d 592, and N.C.G.S. §§ 50-13.1 to -13.2 and 49-14 to -16, noted its belief that the common law had been abrogated by case and statutory law. *Conley*, 24 N.C. App. at 123-24, 210 S.E.2d at 89. The Court of Appeals concluded that the illegitimate child's father was entitled to all rights,

duties, and obligations as was a parent under North Carolina statutes governing custody disputes. *Id.* at 124, 210 S.E.2d at 89-90. The court reasoned that if the father would be entitled to custody under section 50-13.1, surely he would be entitled to visitation. *Id.* at 124, 210 S.E.2d at 90.

In addition to those legislative changes acknowledged by the Court of Appeals in *Conley*, our General Assembly has continually enacted and modified legislation to establish legal ties binding illegitimate children to their biological fathers and to acknowledge the rights and privileges inherent in the relationship between father and child. These provisions operate even where the father acknowledges paternity but fails to have his child judicially legitimated or to seek a judicial determination of paternity. *See, e.g.,* N.C.G.S. § 7B-1111(a)(5) (2001) (providing that parental rights of an illegitimate child's biological father cannot be terminated where the father has established or acknowledged paternity based upon any one of four enumerated methods); N.C.G.S. § 31-5.5 (2001) (entitling afterborn illegitimate children to devises under biological father's will); N.C.G.S. § 49-12.1 (2001) (allowing the putative father to legitimate his biological child, born to a mother married to another man, thus rebutting the well-established presumption that the child is the offspring of the other man); N.C.G.S. § 97-2(12) (2001) (granting "acknowledged" illegitimate children benefits pursuant to our workers' compensation laws); N.C.G.S. § 143-166.2(a) (2001) (including illegitimate children in the definition of "dependent child" for the purpose of allowing them to receive death benefits if their fathers were employed as North Carolina law enforcement officers, firemen, or rescue squad employees).

The General Assembly has also provided a method by which putative fathers may formally acknowledge illegitimate children without initiating legitimation proceedings or judicial determinations of paternity. At the time plaintiff formally acknowledged his paternity, N.C.G.S. § 110-132(a)[3] provided, in pertinent part:

3. The Court of Appeals cited to a version of N.C.G.S. § 110-132(a) appearing in the 1999 edition of our General Statutes. *Rosero,* 150 N.C. App. at 259, 563 S.E.2d at 255; *see also* N.C.G.S. § 110-132(a) (1999) (amended 2001). The 1999 version of N.C.G.S. § 110-132(a) contained amendments from the 1997 session of the General Assembly, which included that portion of the statute that now allows for rescission. Act of Aug. 19, 1997, ch. 433, sec. 4.7, 1997 N.C. Sess. Laws 1275, 1285-86. Because the 1997 amendments did not become effective until October 1997, *see* ch. 433, sec. 11.3, 1997 N.C. Sess. Laws at 1316, it appears that the version cited by the Court of Appeals included the allowance for rescission and was not applicable to plaintiff, who acknowledged his paternity in April of 1997. Thus, the version of the statute contained in the

**ROSERO v. BLAKE**

[357 N.C. 193 (2003)]

In lieu of or in conclusion of any legal proceeding instituted to
establish paternity, the written acknowledgment of paternity exe-
cuted by the putative father of the dependent child when accom-
panied by a written affirmation of paternity executed and sworn
to by the mother of the dependent child . . . shall have the same
force and effect as a judgment . . . .

N.C.G.S. § 110-132(a) (Supp. 1990) (amended 1997 and 2001).[4]

---

1990 cumulative supplement of our General Statutes is the version that we note as
being applicable to plaintiff.

4. N.C.G.S. § 110-132(a), with recent additions underlined and omissions
stricken, now provides:

> **§ 110-132 ~~Acknowledgment~~ Affidavit of ~~paternity~~ parentage and agree-
> ment to support.**
>
> (a) In lieu of or in conclusion of any legal proceeding instituted to establish
> paternity, the written ~~acknowledgment~~ affidavits of ~~paternity~~ parentage executed
> by the putative father ~~of the dependent child when accompanied by a written
> affirmation of paternity executed~~ and ~~sworn to by~~ the mother of the dependent
> child ~~and filed with and approved by a judge of the district court in the county
> where the mother of the child resides or is found, or in the county where the puta-
> tive father resides or is found, or in the county where the child resides or is found~~
> shall constitute an admission of paternity and shall have the same ~~force and~~ legal
> effect as a judgment of ~~that court; and a~~ paternity for the purpose of establishing
> a child support obligation, subject to the right of either signatory to rescind within
> the earlier of:
>
> > (1) 60 days of the date the document is executed, or
> >
> > (2) The date of entry of an order establishing paternity or an order for the
> > payment of child support.
>
> In order to rescind, a challenger must request the district court to order the
> rescission and to include in the order specific findings of fact that the request for
> rescission was filed with the clerk of court within 60 days of the signing of the
> document. The court must also find that all parties, including the child support
> enforcement agency, if appropriate, have been served in accordance with Rule 4
> of the North Carolina Rules of Civil Procedure. In the event the court orders
> rescission and the putative father is thereafter found not to be the father of the
> child, then the clerk of court shall send a copy of the order of rescission to the
> State Registrar of Vital Statistics. Upon receipt of an order of rescission, the State
> Registrar shall remove the putative father's name from the birth certificate. In the
> event that the putative father defaults or fails to present or prosecute the issue of
> paternity, the trial court shall find the putative father to be the biological father as
> a matter of law.
>
> After 60 days have elapsed, execution of the document may be challenged
> in court only upon the basis of fraud, duress, mistake, or excusable neglect. The
> burden of proof shall be on the challenging party, and the legal responsibili-
> ties, including child support obligations, of any signatory arising from the exe-
> cuted documents may not be suspended during the challenge except for good
> cause shown.

**ROSERO v. BLAKE**

[357 N.C. 193 (2003)]

The above-noted statutory changes to our family-law jurisprudence follow or are reflective of many decisions from this Court and the United States Supreme Court. These decisions acknowledge that, absent a showing that the biological or adoptive parents are unfit, that they have otherwise neglected their children's welfare, or that some other compelling reason exists, the paramount rights of both parents to the companionship, custody, care, and control of their minor children must prevail. *See, e.g., Troxel v. Granville,* 530 U.S. 57, 72-73, 147 L. Ed. 2d 49, 61 (2000) (recognizing that "the Due Process Clause [of the United States Constitution] does not permit a [s]tate to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made"); *Caban v. Mohammed,* 441 U.S. 380, 392-93, 60 L. Ed. 2d 297, 307-08 (1979) (holding that gender-based law that allowed a child's unwed mother to withhold consent to adopt the child but did not allow the same as to the child's father violated the Equal Protection Clause); *Stanley v. Illinois,* 405 U.S. 645, 657-58, 31 L. Ed. 2d 551, 562 (1972) (concluding that there was a violation of an unwed father's due process rights where he had custody of his child after the mother had died and the child was taken from him without a hearing on his fitness); *Prince v. Massachusetts,* 321 U.S. 158, 166, 88 L. Ed. 645, 652 (holding that "[i]t is cardinal with us that the cus-

---

A written agreement to support ~~said~~ the child by periodic payments, which may include provision for reimbursement for medical expenses incident to the pregnancy and the birth of the child, accrued maintenance and reasonable expense of prosecution of the paternity action, when acknowledged as provided herein, filed with, and approved by a judge of the district court at any time, shall have the same force and effect as an order of support entered by that court, and shall be enforceable and subject to modification in the same manner as is provided by law for orders of the court in such cases. ~~Such written affirmations, acknowledgments~~ The written affidavit shall contain the social security number of the person executing the affidavit. Voluntary agreements to support shall contain the social security number of each of the parties to the agreement. The written affidavits and agreements to support shall be sworn to before a certifying officer or notary public or the equivalent or corresponding person of the state, territory, or foreign country where the affirmation, acknowledgment, or agreement is made, and shall be binding on the person executing the same whether ~~he~~ the person is an adult or a minor. ~~Such~~ The child support enforcement agency shall ensure that the mother and putative father are given oral and written notice of the legal consequences and responsibilities arising from the signing of an affidavit of parentage and of any alternatives to the execution of an affidavit of parentage. The mother shall not be excused from making ~~such affirmation~~ the affidavit on the grounds that it may tend to disgrace or incriminate her; nor shall she thereafter be prosecuted for any criminal act involved in the conception of the child as to whose paternity she ~~makes affirmation~~ attests.

N.C.G.S. § 110-132(a) (2001).

tody, care and nurtur[ing] of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Owenby v. Young*, 357 N.C. 142, 144-45, 579 S.E.2d 264, 266 (2003) (affirming that biological and adoptive parents have a constitutionally protected liberty interest in the care and custody of their children); *Adams v. Tessener*, 354 N.C. 57, 66, 550 S.E.2d 499, 505 (2001) (holding that in a custody action between natural parents and grandparents, grandparents were properly awarded custody because natural parents' conduct was inconsistent with their protected right to care for the child); *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997) (holding that due process afforded the parents of minor children a superior right to custody of that child in dispute between parents and nonrelatives where the parents have acted consistent with their constitutionally protected status); *Petersen v. Rogers*, 337 N.C. 397, 402-03, 445 S.E.2d 901, 904-05 (1994) (recognizing parents' constitutionally protected right to custody, care, and control of their children); *cf. Skinner v. Oklahoma*, 316 U.S. 535, 86 L. Ed. 1655 (1942) (striking down involuntary sterilization law because it violated fundamental rights to marriage and procreation).

In light of the changes in our laws governing familial relationships, we conclude that the Court of Appeals improperly relied upon *Jolly v. Queen*. The relationship of the father in *Jolly* to his illegitimate child was governed by the strict common-law doctrine of *nullius filius*, dictating the presumption that custody of illegitimate children vested in their mother. The Court in *Jolly* refused to sustain the trial court's findings as to what was in the illegitimate child's best interest, where the child was not entitled to inherit from the father or his father's relatives and could be adopted without the father's consent. *Jolly*, 264 N.C. at 715, 142 S.E.2d at 595-96. As such, the Court was forced to look upon the father, not as a parent entitled to a legal relationship, but as a stranger who wished to take in an unrelated child and raise him as his own.

Since *Jolly*, the General Assembly has modified those statutes governing intestate succession and adoption discussed therein, such that the restrictions imposed upon an unwed father's estate and his right to consent to an adoption *no longer exist*. Unlike the child in *Jolly*, illegitimate children today are entitled to inherit from their fathers and his relatives, and their fathers would be entitled to inherit from them, even though they have not been legitimated. N.C.G.S. § 29-19(b)(2), (c) (2001); *see also Estate of Lucas v. Jarrett*,

55 N.C. App. 185, 188-89, 284 S.E.2d 711, 713-14 (1981) (noting that there was a change in section 29-19(b), the statute governing intestate succession where a child is illegitimate, since the decision in *Jolly*). Additionally, the consent of illegitimate children's fathers who acknowledged paternity would now be required for their adoption. *See* N.C.G.S. § 48-3-601(2)(b) (2001). Further, in contrast to the father in *Jolly*, illegitimate children's fathers, including plaintiff, now benefit from the provisions of N.C.G.S. § 110-132(a), providing another method for formal acknowledgment of paternity, and other statutory provisions establishing legal ties between illegitimate children and their fathers, even though they may not have pursued legitimation procedures.

Moreover, we disagree with the Court of Appeals' majority that the vast changes to the law discussed above indicate only a patchwork of abrogations to the common law such that the presumption for awarding custody of an illegitimate child is still the law in this state. The majority reasoned that the differences between sections 110-132(a) and 49-14 support its conclusion that the presumption still exists, even where a father acknowledges paternity via section 110-132(a) and embraces his role as the illegitimate child's father. *See Rosero*, 150 N.C. App. at 258-59, 563 S.E.2d at 254. Unlike the Court of Appeals, we find the divergent purposes underlying the article in which N.C.G.S. § 110-132(a) is contained, to provide child support, and N.C.G.S. § 49-14, to determine paternity, irrelevant. The legislative intent of the comprehensive statutes addressing child welfare should be the paramount consideration. *See Brown v. Flowe*, 349 N.C. 520, 523-24, 507 S.E.2d 894, 896 (1998) (noting that this Court construes multiple statutes governing a single subject *in pari materia* to effectuate legislative intent and "to harmonize them into one law on the subject"). Given the changes to our General Statutes discussed *supra*, the effects of acknowledging paternity, a judicial determination of paternity, and legitimation proceedings are similar: The illegitimate child is able to inherit by and through the father, the father is able to inherit from his child, and the father's consent is needed for adoption.

We also note that the Court of Appeals' majority found support for its conclusion in the distinction between the high standard for establishing paternity judicially under section 49-14, that is, by clear and convincing evidence, and the complete lack of standards for acknowledging paternity in section 110-132(a). *Rosero*, 150 N.C. App. at 259, 563 S.E.2d at 254-55. The majority further found it significant

that acknowledgment under the version of section 110-132(a) appearing in the 1999 edition of our General Statutes could be rescinded, while a judicial determination of paternity was absolute. *Id.* According to the Court of Appeals, these distinctions indicated that a father acknowledging paternity under section 110-132(a) was not on equal footing with the father who had received a judicial determination of paternity. Thus, the court reasoned, the maternal-preference presumption still applied to the detriment of the father who acknowledged paternity under N.C.G.S. § 110-132(a). *Id.* at 260, 563 S.E.2d at 255. Again, we disagree. Although section 110-132(a) does not provide for even a modicum of proof of paternity, it does require, in both the current version and the version in effect for this case, that the child's mother affirm that the acknowledging father is, in fact, the natural father. Such a requirement prevents a man from "simply declar[ing] his paternity of a child unilaterally and easily fil[ing] for a court order approving his acknowledgment and agreement to support." *Durham Cty. Dep't of Soc. Servs. v. Williams*, 52 N.C. App. 112, 117 n.3, 277 S.E.2d 865, 869 n.3 (1981). Furthermore, whether the affirmation of paternity can be rescinded is irrelevant. At the time custody is adjudicated, a father who affirms his paternity pursuant to section 110-132(a) and pays child support in conjunction with that affirmation is acting consistent with his right to care for and have control of the child. As with any custody determination, the arrangement arrived at by the trial court can subsequently yield to a modification based upon a substantial change in circumstances.

Given the legal relationship between fathers and their illegitimate children now existing by virtue of certain statutory enactions, we believe that the legislature's 1977 modifications to N.C.G.S. § 50-13.2(a) represent an express abrogation of the common-law presumption at issue in the present case. As noted *supra*, given the unambiguous 1977 modification, N.C.G.S. § 50-13.2(a) now provides that "[b]etween the mother and father, whether natural or adoptive, no presumption shall apply as to who will better promote the interest and welfare of the child." We are unpersuaded by defendant's argument that N.C.G.S. § 50-13.2(a) applies only to abrogate the so-called "tender years" doctrine, which previously provided that a mother had the superior right to custody of her young children. *See Westneat v. Westneat*, 113 N.C. App. 247, 251, 437 S.E.2d 899, 901 (1994). To determine whether N.C.G.S. § 50-13.2(a) abrogated the presumption at issue, we must examine its plain language. *State v. Dellinger*, 343 N.C. 93, 95, 468 S.E.2d 218, 220 (1996). "When the language of a statute is clear and unambiguous, there is no room for judicial con-

struction, and the courts must give it its plain and definite meaning."
*Lemons v. Old Hickory Council, BSA, Inc.*, 322 N.C. 271, 276, 367
S.E.2d 655, 658 (1988) (citations omitted). Neither section 50-13.2(a)
nor the case in which the Court of Appeals held that the "tender
years" doctrine was no longer applicable, *Westneat*, expressly pro-
vides that the statute abrogates only the "tender years" doctrine.
There is absolutely nothing in the plain language of section 50-13.2(a)
or *Westneat* that supports defendant's assertion. We therefore con-
clude that, by its plain language, the statute clearly abrogates the
common-law presumption vesting custody of an illegitimate child in
the child's mother.

Applying N.C.G.S. § 50-13.2(a) in such a manner is not only dic-
tated by its plain language, but also ensures that the best interest of
the child, illegitimate or legitimate, not the relationship, or lack
thereof, between natural or adoptive parents, is the district court's
paramount concern. For, as between natural or adoptive parents,
"[t]he welfare of the child has always been the polar star which
guides the courts in awarding custody." *Pulliam v. Smith*, 348 N.C.
616, 619, 501 S.E.2d 898, 899 (1998); *see also Owenby*, 357 N.C. at 145,
579 S.E.2d at 267. Several courts in our sister states have applied this
same reasoning to find the common-law presumption for awarding
custody in favor of the illegitimate child's mother no longer applica-
ble, with varying degrees of consideration given to the method by
which the father acknowledged or established paternity. *See Heyer v.
Peterson*, 307 N.W.2d 1, 7 (Iowa 1981) (noting that "the controlling
consideration must be the interests of the child"); *Cox v. Hendricks*,
208 Neb. 23, 27, 302 N.W.2d 35, 38 (1981) (acknowledging and adopt-
ing the "clear trend in recent cases . . . to disregard the fact that a
child was born out of wedlock in deciding custody disputes between
natural parents"); *In re Byrd*, 66 Ohio St. 2d 334, 338, 421 N.E.2d
1284, 1286-87 (1981) (recognizing that use of best interest standard,
rather than the maternal-preference presumption, promotes equality
between the right of legitimate and illegitimate children to be placed
with the parent who would promote their best interest); *see also Pi v.
Delta*, 175 Conn. 527, 530-31, 400 A.2d 709, 710-11 (1978) (concluding
that although state statute provides that the mother of an illegitimate
child was that child's sole guardian, custody should be determined
according to what is in the child's best interest); *Bazemore v. Davis*,
394 A.2d 1377, 1379 (D.C. Ct. App. 1978) (noting that in custody dis-
putes between natural parents, the best interest of the child standard
applies); *Race v. Sullivan*, 612 So. 2d 660, 661 (Fla. Dist. Ct. App.
1993) (holding that "[t]he shared parental responsibility law . . . is

applicable to non-married parents" and that the best interest of the child standard applies as between non-married parents); *In re Custody of Bourey*, 127 Ill. App. 3d 530, 533, 469 N.E.2d 386, 388 (1984) (noting that "the best interest of the child guides the decision, no matter what form the proceedings may take"); *La Grone v. La Grone*, 238 Kan. 630, 632-33, 713 P.2d 474, 476 (1986) (holding that "an unwed parent, whether mother or father, should be treated the same as any other parent for the purpose of determining custody" and that the best interest of the child standard should apply); *Walton v. Deblieux*, 428 So. 2d 937, 939 (La. Ct. App. 1983) (holding that "[t]he criteria applicable in determining the custody of legitimate children are also applicable in determining the custody of illegitimate children"). *But see Ex parte D.J.*, 645 So. 2d 303 (Ala. 1994) (per curiam) (concluding that maternal presumption for custody of an illegitimate child was still good law in that state); *Taylor v. Commonwealth*, 260 Va. 683, 537 S.E.2d 592 (2000) (holding that defendant's status as fiancée to the unwed father of the ten-month-old victim did not excuse the defendant's actions in assisting in the kidnapping of the child because the right of the father to immediate custody of the child was inferior to that of the mother). If the reasoning of the Court of Appeals in its 1974 decision in *Conley v. Johnson* was correct—that the common-law presumption in favor of the mother had already been abrogated by case law and the 1967 amendments to our General Statutes—there is no question that the presumption no longer exists in this, the twenty-first century.

The above-noted modification to N.C.G.S § 50-13.2(a) was an abrogation of the common-law presumption at issue in the present case. That abrogation, coupled with those changes to our General Statutes recognizing the legal relationship between parent and illegitimate child, establishes that an illegitimate child's father who has acknowledged or affirmed his paternity under section 110-132(a) and whose conduct is consistent with his right to care for and control his child, no longer stands as a third party in relation to his illegitimate child. We therefore hold that the father's right to custody of his illegitimate child is legally equal to that of the child's mother, and, as dictated by section 50-13.2, if the best interest of the child is served by placing the child in the father's custody, he is to be awarded custody of that child. Accordingly, in the present case, the trial court did not err in applying the best interest of the child standard.

As we have determined that the best interest of the child standard was properly applied in the present case, we must now

review the trial court's findings of fact and conclusions of law in accordance with that standard. "In a custody proceeding, the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *Owenby*, 357 N.C. at 147, 579 S.E.2d at 268. Our review of the custody order in the case at issue reveals that the trial court's findings of fact are supported by record evidence and that those findings, in turn, support the trial court's conclusions of law. We therefore affirm the trial court's order awarding custody of Kayla to plaintiff.

In conjunction with plaintiff's appeal of right discussed *supra*, this Court granted plaintiff's petition for discretionary review of an additional issue: Whether the common-law presumption that the mother of an illegitimate child retains a superior right to that child's custody violates the Equal Protection Clause of the United States and North Carolina Constitutions. Because we have determined that this presumption has been abrogated by statute, we need not address whether it violates plaintiff's rights under the United States and North Carolina Constitutions. *See Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002) (per curiam) (noting that "the courts of this [s]tate will avoid constitutional questions, even if properly presented, where a case may be resolved on other grounds").

Because a mother's right to the custody of her illegitimate child is no longer superior to that of the child's father, the trial court properly applied the best interest of the child standard as between the parties to the present action. Furthermore, the evidence of record supports the trial court's findings of fact, which further supports the trial court's conclusion that awarding custody of Kayla to plaintiff was in Kayla's best interest. Accordingly, we reverse the Court of Appeals' decision and remand this case to that court for further remand to the District Court, Wake County, for reinstatement of the trial court's order.

REVERSED.