REGGIE L. CRENSHAW, Plaintiff v. ALAINA D. WILLIAMS, F/K/A ALAINA CRENSHAW Defendant

No. COA10-720

(Filed 19 April 2011)

**1. Child Custody and Support— foreign support order— improper modification**

The trial court lacked authority to modify a Michigan child support order, and the portion of the trial court's order modifying defendant mother's support obligation was reversed.

**2. Child Custody and Support— foreign custody order—modification—substantial change in circumstances—best interests of child**

The trial court did not abuse its discretion by modifying a Michigan child custody order. The evidence revealed substantial changes in circumstances affecting the welfare of the minor children and that modification was in the best interests of the children.

Appeal by defendant from order entered 6 July 2009 by Judge Christy T. Mann in Mecklenburg County District Court. Heard in the Court of Appeals 24 January 2011.

*Todd W. Cline, P.A., by Todd W. Cline, for plaintiff-appellee.*

*James, McElroy & Diehl, P.A., by Preston O. Odom III, for defendant-appellant.*

HUNTER, Robert C., Judge.

Defendant Alaina D. Williams (formerly Crenshaw) appeals from the trial court's order modifying a custody order entered in Michigan and granting plaintiff Reggie L. Crenshaw primary custody of the couple's two sons, Jhavon-Gabriel and Christian. After careful review, we reverse in part and affirm in part.

Facts

On 15 August 2002, the Circuit Court for Wayne County, Michigan entered a "Judgment of Divorce" (the "Michigan divorce judgment"), which granted the parties a divorce and awarded them "joint legal and joint physical custody" of the juveniles. Under the terms of the judgment, "primar[y]" custody of the juveniles was with Ms. Williams for the first three years after entry of the Michigan divorce judgment (August 2002-August 2005) and then alternated to Mr. Crenshaw for the second three-year period (August 2005-August 2008). At the time of the couple's divorce, Mr. Crenshaw was living in Dearborn, Michigan and Ms. Williams was living in Norcross, Georgia, near Atlanta. Mr. Crenshaw moved to Charlotte, North Carolina shortly after the Michigan divorce judgment was entered.

When Ms. Williams refused to "agree to the switch" in custody in 2005, Mr. Crenshaw filed a motion in Michigan state court requesting enforcement of the terms of the Michigan divorce judgment. After holding a hearing on 15 August 2005, the Michigan circuit court entered an "Order for Change of Custody" (the "Michigan custody

order") on 6 September 2005, in which the court determined that "it was in the best interests of the minor children to enforce the custody agreement set forth in the [Michigan divorce judgment] . . . ." The custody order also directed Ms. Williams to pay child support to Mr. Crenshaw while he had primary custody. Mr. Crenshaw has retained custody of Jhavon and Christian since entry of the 2005 Michigan custody order.

Mr. Crenshaw married Myra McCaskill on 9 June 2007. Ms. McCaskill helps parent Jhavon and Christian, including helping them with their homework, driving them to and from activities, buying them clothes, and cooking meals for them. Mr. Crenshaw and Ms. McCaskill have been members of the PTA Boards of their sons' schools and have participated on the schools' Leadership Teams. Ms. Williams has not volunteered at her sons' schools since they moved to Charlotte to live with their father.

Mr. Crenshaw and Ms. McCaskill also encourage and support the children's participation in sports. Mr. Crenshaw has helped coach football teams on which the boys played and paid for Christian to attend a football camp in the Atlanta area during the summer of 2008.

Ms. Williams has had "sporadic employment" since August 2005, working as an insurance adjuster, substitute teacher, waitress, and working for her family's home renovation business. Ms. Williams is currently unemployed and living off of her savings. Her parents own the townhome in which she lives and allow her to live there rent-free in exchange for working for the family business.

Since August 2005, Ms. Williams has missed four or five visits with Jhavon and Christian. On some weekend visits, Ms. Williams will give up spending Friday nights with the children because Saturday morning flights typically are less expensive.

Ms. Williams is late for "the majority" of exchanges, often returning Jhavon and Christian to Charlotte after 9:00 p.m. on Sunday nights. When she does not return them on Sunday nights, Ms. Williams will leave Norcross around 3:00 a.m. and drive the children directly to their schools in Charlotte. When Jhavon and Christian return from visiting their mother, they typically are "exhausted" and Mr. Crenshaw and Ms. McCaskill are left to "deal with the ramifications of the exhaustion."

Mr. Crenshaw and Ms. Williams are "[r]arely" able to agree on issues involving their children. Because Ms. Williams often yells and

curses at Mr. Crenshaw on the telephone, he usually resorts to communicating with her through email. Although Mr. Crenshaw notifies Ms. Williams through email about Jhavon's and Christian's activities, she does not fully participate in the activities.

The parties also differ regarding dietary habits, health care, and time spent with the children. Ms. Williams does not support the children seeing medical doctors and they often come home to Charlotte sick. While Mr. Crenshaw disciplines Jhavon and Christian by taking away their privileges, Ms. Williams does not discipline them because they "see eye to eye" on most issues.

Mr. Crenshaw's position with Wachovia was eliminated in November 2008, but he obtained employment that same month with ServiceMaster, which is headquartered in Memphis, Tennessee. On 3 November 2008, Mr. Crenshaw registered the 2002 Michigan divorce judgment and 2005 custody order in Mecklenburg County, requesting modification of custody and child support. At the time of the 6 April and 17 June 2009 hearings on Mr. Crenshaw's motions in Mecklenburg County District Court, Mr. Crenshaw planned on moving his family to the Memphis area in late June or early July of 2009.

The district court entered an order on 6 July 2009, concluding that "Mr. Crenshaw ha[d] met his burden of showing that a change in circumstances actually has occurred, and that the changes have affected the welfare of Jhavon and Christian" and awarding him "primary custody" of the children. The court also concluded that Ms. Williams should pay $454 per month in child support; that she was currently $16,400 in arrears; and that she should pay an additional $100 per month "towards retirement of the arrearage." Ms. Williams filed numerous post-trial motions, including a "Motion for New Trial and to Amend Findings of Fact," a "Motion for Relief from Child Support Order and for Sanctions," and a "Motion to Extract Fraudulent Evidence." The trial court denied Ms. Williams' motions on 26 October 2009. Ms. Williams timely appealed to this Court.

## Support

[1] Ms. Williams first contends that the Michigan child support order was not properly registered under the Uniform Interstate Family Support Act ("UIFSA"), codified in Chapter 52C of the North Carolina General Statutes, and thus "the trial court lacked authority to address the issue of child support." Whether the trial court complied with the registration procedures set out in UIFSA is a question of law

reviewed de novo on appeal. *State ex rel. Lively v. Berry*, 187 N.C. App. 459, 462, 653 S.E.2d 192, 194 (2007).

UIFSA, enacted in North Carolina in 1995, was "promulgated and intended to be used as [a] procedural mechanism[] for the establishment, modification, and enforcement of child and spousal support obligations." *Welsher v. Rager*, 127 N.C. App. 521, 524, 491 S.E.2d 661, 663 (1997); *accord New Hanover Cty. ex rel. Mannthey v. Kilbourne*, 157 N.C. App. 239, 243, 578 S.E.2d 610, 613-14 (2003) ("Enacted by states as a mechanism to reduce the multiple, conflicting child support orders existing in numerous states, UIFSA creates a structure designed to provide for only one controlling support order at a time [.]").

Under UIFSA, a child support order is first entered by the "issuing tribunal" in the "issuing state." N.C. Gen. Stat. § 52C-1-101(9) and (10) (2009); *Hook v. Hook*, 170 N.C. App. 138, 141, 611 S.E.2d 869, 871, *disc. review denied*, 359 N.C. 631, 616 S.E.2d 234 (2005). N.C. Gen. Stat. § 52C-6-609 (2009) establishes that if an obligee wants to modify an order against an obligor who resides in a different state, the obligee must "register" the order in the state in which the obligor resides. *See* N.C. Gen. Stat. § 52C-6-609 cmt. ("A petitioner wishing to register a support order of another state for purposes of modification must . . . follow the procedure for registration set forth in [N.C. Gen. Stat. § 52C-6-602 (2009),]" which requires registration in "the tribunal for the county in which the obligor resides in this State[.]").

It is undisputed in this case that Ms. Williams is not a resident of North Carolina; she resides in Georgia. Consequently, Mr. Crenshaw, as the party seeking modification in this case, was required by N.C. Gen. Stat. §§ 52C-6-602 and -609 to register the Michigan support order in Georgia, not North Carolina:

> In the overwhelming majority of cases, the party seeking modification must seek that relief in a new forum, almost invariably the State of residence of the other party. This rule applies to either obligor or obligee, depending on which of those parties seeks to modify. . . .
>
> . . . . This restriction attempts to achieve a rough justice between the parties in the majority of cases by preventing a litigant from choosing to seek modification in a local tribunal to the marked disadvantage of the other party. . . . In short, the obligee is required to register the existing order and seek modification of that order in a State which has personal jurisdiction over the

obligor other than the State of the obligee's residence. Most typically this will be the State of residence of the obligor. . . .

N.C. Gen. Stat. § 52C-6-611 cmt (2009). As North Carolina is not the proper forum for modifying the Michigan support order, the trial court lacked the authority to modify that order. *See Lacarrubba v. Lacarrubba,* —— N.C. App. ——, ——, 688 S.E.2d 769, 773 (2010) (concluding North Carolina court "lacked authority to modify [New York child support] order or reduce arrearages" where obligee, who resided in Florida, registered foreign order in North Carolina for "enforcement only" and obligee did not consent to personal jurisdiction in North Carolina). Consequently, the portion of the trial court's order modifying Ms. Williams' child support obligations is reversed.

## Custody

**[2]** Ms. Williams also contends that the trial court erred in modifying the Michigan custody order. N.C. Gen. Stat. § 50-13.7(b) (2009) provides that "when an order for custody of a minor child has been entered by a court of another state, a court of this State may, upon gaining jurisdiction, and a showing of changed circumstances, enter a new order for custody which modifies or supersedes such order for custody." As a threshold issue, we note that the trial court had subject-matter jurisdiction under N.C. Gen. Stat. § 50A-203(2) (2009) to modify the Michigan custody order as the record indicates that North Carolina was the juveniles' "home state" at the time this custody action was initiated, *see* N.C. Gen. Stat. § 50A-102(7) (2009), and neither the juveniles nor their parents continued to reside in Michigan. *See In re T.J.D.W.,* 182 N.C. App. 394, 397, 642 S.E.2d 471, 473 (holding trial court had jurisdiction to modify South Carolina custody order where "the child and a parent . . . lived in North Carolina for the six months immediately preceding the commencement of the proceeding" and "the child and both parents had left South Carolina at the time of the commencement of the proceeding"), *aff'd per curiam,* 362 N.C. 84, 653 S.E.2d 143 (2007).

Our Courts have interpreted N.C. Gen. Stat. § 50-13.7(b) as authorizing trial courts to modify a foreign custody order if the party moving for modification shows that " 'a substantial change of circumstances affecting the welfare of the child' " warrants a change in custody. *Pulliam v. Smith,* 348 N.C. 616, 619, 501 S.E.2d 898, 899 (1998) (quoting *Blackley v. Blackley,* 285 N.C. 358, 362, 204 S.E.2d 678, 681 (1974)). "The party seeking the custody change has the burden of showing the requisite change." *Metz v. Metz,* 138 N.C. App. 538, 540, 530 S.E.2d 79,

80 (2000). In determining whether modification is warranted, the trial court engages in a two-step analysis: the court first determines whether there has been a substantial change in circumstances affecting the welfare of the child involved, and, if so, the court then determines whether modification of custody is in the child's best interest. *Shipman v. Shipman*, 357 N.C. 471, 474, 586 S.E.2d 250, 253 (2003).

When reviewing a trial court's order modifying custody, the appellate court must determine whether the trial court's findings are supported by substantial evidence and, in turn, whether the court's findings support its conclusions of law. *Id.* If supported by substantial evidence, the trial court's findings are binding on appeal, despite the existence of evidence that might support contrary findings. *Pulliam*, 348 N.C. at 625, 501 S.E.2d at 903. Unchallenged findings are "presumed to be supported by competent evidence and [are] binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). The trial court's conclusions of law, however, are reviewed de novo. *Scott v. Scott*, 157 N.C. App. 382, 385, 579 S.E.2d 431, 433 (2003). " '[T]he trial court is vested with broad discretion in cases involving child custody,' and its decision [to modify custody] will not be reversed on appeal absent a clear showing of abuse of discretion." *Karger v. Wood*, 174 N.C. App. 703, 705, 622 S.E.2d 197, 200 (2005) (quoting *Pulliam*, 348 N.C. at 624-25, 501 S.E.2d at 902) (second alteration added).

Ms. Williams first contends that "the trial court's decision regarding child support tainted its concurrent decision regarding custody modification[.]" In support of her argument, Ms. Williams points to Lee's North Carolina Family Law, where Professor Suzanne Reynolds explains: "[I]t is the law of child support, not custody, that should address disparities in standards of living. If the better custodian cannot provide for the child's economic needs, then an award of child support—not a disposition of custody—should address those needs." Suzanne Reynolds, 3 *Lee's North Carolina Family Law* § 13.29 (5th ed. 2002) [hereinafter *Lee's Family Law*]; *see also Jolly v. Queen*, 264 N.C. 711, 715, 142 S.E.2d 592, 596 (1965) (observing that if a trial court were permitted to base a custody determination on comparative standards of living, "a judge might find it to be in the best interest of a legitimate child of poor but honest, industrious parents, who were providing him with the necessities, that his custody be given to a more affluent neighbor or relative who had no child and desired him").

Professor Reynolds further explains, however, that, while "the law of custody discourages the making of custody decisions based on relative standards of living[,]" it is "not error for the [court's] findings

to include these comparisons" so long as its findings "reveal that other factors were more important." *Lee's Family Law* § 13.29. Here, in addition to making findings regarding the parties' respective incomes and standards of living, the trial court also made findings addressing: Mr. Crenshaw (and Ms. McCaskill's) level of involvement in Jhavon's and Christian's education and extra-curricular activities, and Ms. Williams' lack of "full[] participat[ion]" in the boys' activities; Ms. Williams' missing four or five visits per year with her children and her election to "forgo" Friday nights during some weekend visits; Ms. Williams' returning the boys "exhausted" at the end of weekend visits; Ms. Williams' disapproval of the children seeing medical doctors and her returning the boys "with colds"; and Mr. Crenshaw's disciplining the boys by taking away their privileges and Ms. Williams' not disciplining them.

The trial court's findings demonstrate that it considered factors beyond the parties' relative incomes and standards of living in determining whether there had been a substantial change in circumstances affecting the children's welfare. *See Metz*, 138 N.C. App. at 541, 530 S.E.2d at 81 ("affirming trial court's order finding a substantial change of circumstances affecting the child's welfare where, in addition to considering parents' relative standards of living, trial court made findings regarding other factors, including child's educational and developmental needs and custodial parent's work schedule); *see also White v. White*, 90 N.C. App. 553, 558, 369 S.E.2d 92, 95 (1988) ("Plaintiff argues that she is being denied custody of her child because defendant has a greater income. We disagree. Defendant's income and stable home environment simply provide part of the basis for determining that the child's best interests and welfare will be promoted by awarding custody to defendant.").

Ms. Williams next contends that "[s]everal of the trial court's findings of fact lack competent evidentiary support." She complains of various "nuanced discrepancies between the evidence and factual findings," contending, for example, that there is no evidentiary support for the date stated in the order regarding Mr. Crenshaw's and Ms. McCaskill's marriage; that, contrary to the court's characterization of the evidence, her written request for an extension to respond to Mr. Crenshaw's petition for registration constitutes a "response"; that, contrary to the court's characterization, she did not "cancel[]" four to five visits a year, she simply "miss[ed]" four to five visits a year; that the court's description of Mr. Crenshaw and Ms. McCaskill having to "deal" with the boys being "exhausted" when she drives them directly

to school in Charlotte from Atlanta is a "stretch[]"; and, that, contrary to the court's statement that the "present custody schedule is not working well," it is only the "present exchange procedure" that is "problematic."

Assuming, without deciding, that the challenged findings are not supported by evidence in the record, Ms. Williams, as the appellant, "must not only show error, but also that the error is material and prejudicial, amounting to a denial of a substantial right and that a different result would have likely ensued." *Cook v. Southern Bonded, Inc.*, 82 N.C. App. 277, 281, 346 S.E.2d 168, 171 (1986), *disc. review denied*, 318 N.C. 692, 351 S.E.2d 741 (1987). Ms. Williams fails to provide any explanation as to how any of these "nuanced discrepancies" are material or prejudicial. This argument is overruled.

Ms. Williams also argues that the trial court's findings do not support its conclusion that Mr. Crenshaw satisfied his burden of proving that a substantial change of circumstances affecting the children's welfare has occurred. Ms. Williams argues that Mr. Crenshaw failed to demonstrate a substantial change in circumstances because "the disparity in the parties' respective stability" was the basis for the 2005 Michigan custody order that "switched" custody from Ms. Williams to Mr. Crenshaw and there has been no change in the parties' respective "financial and occupational stability." Our courts have held that when the circumstances existing at the time of the request for modification are the same as the circumstances at the time of the initial custody determination, the trial court lacks the basis to modify the initial custody order. *See Tucker v. Tucker*, 288 N.C. 81, 88, 216 S.E.2d 1, 5 (1975) ("There is no evidence in this record of any substantial change in conditions affecting the welfare of Timmy between 7 June 1974 and 7 August 1974. The friction between the parents had existed from the date of the first custody order in 1973."); *Ford v. Wright*, 170 N.C. App. 89, 96, 611 S.E.2d 456, 461 (2005) ("As the trial court had already considered the parties' past domestic troubles and communication difficulties in the prior order, without findings of additional changes in circumstances or conditions, modification of the prior custody order was in error."); *see also Lee's Family Law* § 13.106(b) (explaining that if "the existing facts are no different from the facts before the court at the time of the previous order, then the court has no basis to modify the order").

As the trial court's findings indicate, the evidence in this case reveals material changes in the circumstances—with respect to the

parties' comparative stability as well as other considerations— between the time of the hearing resulting in the Michigan custody order and the modification proceedings in this case. Here, the court specifically found that since entry of the Michigan custody order "Mr. Crenshaw and Ms. McCaskill, his present spouse, have been members of PTA Boards at each child's school, and they have participated on the schools' Leadership Teams" and that "Ms. Williams has not volunteered at the minor children's schools"; that "Mr. Crenshaw has helped coach football teams on which the boys played, and he and Ms. McCaskill encourage and support the sports in which the children participate"; that Ms. McCaskill "assists with parenting" the children, helps them with their homework, provides transportation, and generally helps take care of them; that although Mr. Crenshaw's position with Wachovia was eliminated, he found other employment and "[h]is prospects for future employment in the position are good"; that his "monthly income totals $20,833" and that he is able to pay for the children's insurance; that Mr. Crenshaw has shown financial and "vocational stability" while Ms. Williams' average monthly income over the past three years is $1,584 and she is currently unemployed; that since August 2005, Ms. Williams misses roughly four or five visits with her sons each year and often forgoes the Friday night portion of weekend visits because "flights typically are less expensive when the children leave Charlotte on a Saturday"; that "Ms. Williams is late for the majority of exchanges," often not returning the boys to Charlotte until after 9:00 p.m. on Sunday nights before school or leaving the Atlanta area around 3:00 a.m. Monday mornings and driving the boys directly to their schools; that "[w]hen the children return from visiting Ms. Williams, they typically are exhausted, and Mr. Crenshaw and Ms. McCaskill have to deal with the ramifications of the exhaustion"; that "Ms. Williams does not support the children seeing medical doctors, and they often return to Charlotte with colds"; that while Mr. Crenshaw disciplines the boys by restricting their privileges, Ms. Williams does not discipline them; that although Ms. Williams has "spent good quality time" with her children, she has not visited with them "consistent[ly]"; that while Mr. Crenshaw advises Ms. Williams of the boy's activities, she "has not fully participated in these activities"; and, that the "minor children are bright, well mannered [sic] and well-adjusted" and are "involved in their respective schools, in sports and in the community."

These unchallenged findings support the trial court's conclusion that "Mr. Crenshaw has met his burden of showing that a change in circumstances actually has occurred, and that the changes have

affected the welfare of Jhavon and Christian." *See Shipman*, 357 N.C. at 480-81, 586 S.E.2d at 257 (concluding that "culmination of a series of developments that occurred after the original custody decree" established "substantial change in circumstances" where father "secured new employment," father owned a house with girlfriend, father and girlfriend could "provide for the child," and girlfriend helped take care of child). This contention is overruled.

Ms. Williams further argues that the trial court's findings fail to indicate that the court considered the impact on the children's welfare of Mr. Crenshaw's planned relocation to Memphis. Ms. Williams is correct that a parent's relocation is not, without more, "a substantial change in circumstances affecting the welfare of the child which justifies a modification of a custody decree." *Evans v. Evans*, 138 N.C. App. 135, 140, 530 S.E.2d 576, 579 (2000). Rather, where a parent relocates, "the effect on the welfare of the child must be shown in order for the court to modify a custody decree based on change of circumstance." *Gordon v. Gordon*, 46 N.C. App. 495, 500, 265 S.E.2d 425, 428 (1980), *overruled on other grounds by Pulliam v. Smith*, 348 N.C. 616, 501 S.E.2d 898 (1998).

Here, the trial court's uncontested findings establish that the court considered the impact of the relocation on the boys' welfare. Specifically, the court found that Mr. Crenshaw took a job with ServiceMaster in Memphis after he lost his job with Wachovia in Charlotte and that he plans to relocate his family to the Memphis area because "[h]is prospects for future employment in this position are good" and his monthly salary of $20,833 allows him to "support the children financially." This argument is overruled.

Ms. Williams also argues that the trial court's findings regarding "the parties' purported difficulties concerning communication and visitation" fail to support its conclusion that the children's welfare has been affected by a substantial change in circumstances. With respect to this issue, the court's findings indicate that, since entry of the Michigan custody order, Ms. Williams has missed four to five visits with her children a year; that, during weekend visits, she will "forgo" having the children on Friday nights because it is cheaper for the children to fly to Atlanta on Saturdays; that she is "late for the majority of exchanges, oftentimes returning the children to Charlotte after 9 pm on a Sunday night before school resumes"; that when she fails to return the children on Sundays, she will "leave [Atlanta] around 3 am and drive the children directly to their schools in

CRENSHAW v. WILLIAMS

[211 N.C. App. 136 (2011)]

Charlotte"; that the boys are "exhausted" after visiting with Ms. Williams and it is "Mr. Crenshaw and Ms. McCaskill that have to deal with the ramifications of the exhaustion"; that "[t]he parties' communication about the children is dysfunctional" and that they are "[r]arely . . . able to resolve issues regarding the children," including "dietary habits, health care and time with the children"; that "Ms. Williams does not support the children seeing medical doctors," and the children often are sick when they return to Charlotte; and, that Ms. Williams does "not fully participate[]" in the children's activities despite being notified of them by Mr. Crenshaw. Contrary to Ms. Williams' argument, these findings reveal how the parties' communication and visitation "problems" affect the children's welfare.

In her final argument on appeal, Ms. Williams challenges the trial court's conclusion that modification of the Michigan custody order and granting Mr. Williams primary custody is "in the best interests of Jhavon and Christian." Although Ms. Williams asserts that the trial court's "best interests" determination is not supported by the evidence or its findings, where, as here, the appellate court "determine[s] that the trial court has properly concluded that the facts show that a substantial change of circumstances has affected the welfare of the minor child and that modification was in the child's best interests, [the appellate court] will defer to the trial court's judgment and not disturb its decision to modify an existing custody agreement." *Shipman*, 357 N.C. at 475, 586 S.E.2d at 254. Consequently, that portion of the trial court's order modifying custody is affirmed.

Reversed in part; affirmed in part.

Chief Judge MARTIN and Judge THIGPEN concur.