An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-151

Filed 18 February 2026

Moore County, No. 22JA000024-620

IN THE MATTER OF: J.F.

Appeal by respondent-father from order entered 20 September 2024 by Judge Warren McSweeney in Moore County District Court. Heard in the Court of Appeals 23 September 2025.

*Mary McCullers Reece, for respondent-appellant-father.*

*Wilson, Reives & Doran, PLLC, by Nathalie M. Doran, for intervenor-petitioner-appellees.*

*McTier Law PLLC, by Ty K. McTier, for appellee guardian ad litem.*

*Sharlene Gilmer Anderson, for petitioner-appellee Moore County Department of Social Services.*

FLOOD, Judge.

Respondent-Father appeals from a permanency planning order, which granted guardianship of his minor child J.F. ("Jon")[1] to Jon's maternal step-grandmother ("Grandmother") and grandfather ("Grandfather") (collectively, "Grandparents"). On

---

[1] Pseudonyms are used to protect the juvenile's identity pursuant to N.C. R. App. P. 42(b).

appeal, Respondent-Father argues the trial court erred by: first, concluding Respondent-Father waived his constitutionally protected parental status; second, allowing Grandparents to intervene as parties to the action; and third, denying Respondent-Father's motion for recusal of the trial judge. Upon careful review, we hold the trial court did not err in concluding Respondent-Father waived his constitutionally protected parental status. Additionally, we dismiss Respondent-Father's second and third arguments regarding Grandparents' intervention and motion for recusal because Respondent-Father failed to properly preserve these issues for appeal.

## I. **Factual and Procedural Background**

Jon was born on 17 September 2019 to Respondent-Mother. For approximately the first year of his life, Jon was in Mother's custody and care.[2] In August 2020, the New Hanover County Department of Social Services ("NHCDSS") became aware of Jon's health and physical condition when Jon was rushed to the hospital following a bout of unconsciousness. At that time, hospital personnel noted "some bruising" on Jon's left flank.

In October 2020, Mother left Jon in the care of Grandparents for a brief visit. During this visit, Grandparents discovered numerous bruises on Jon and decided to take Jon to the UNC-Chapel Hill Hospital so that his physical well-being could be

---

[2] Mother is not an appellant in this matter; therefore, her actions as to Jon are not at issue.

evaluated. After evaluating Jon, the treating physician noted: bruising on Jon's "right cheek, nasal bridge, left shoulder, sole of left foot, left thigh, left buttock, right thigh[,] and left breast"; "the pattern of the left thigh injury was 'concerning for a cigarette burn' and is located in an area where accidental contact would be unlikely"; and "the pattern of the[] bruises in a not[-]yet[-]ambulatory child is concerning . . . ."

On 14 October 2020, NHCDSS filed a juvenile petition, naming Respondent-Father as the putative father of Jon and alleging Jon was an abused and neglected juvenile. Later that same day, the New Hanover District Court entered an order granting nonsecure custody to NHCDSS and approving placement with Grandparents. On 21 October 2020, the New Hanover District Court held a pre-disposition hearing, which Respondent-Father attended. At the hearing, Respondent-Father consented to continued non-secure custody of Jon, and the trial court ordered him to submit to a paternity test.

In February 2021, the trial court adjudicated Jon neglected and abused, ordered legal custody of Jon to remain with NHCDSS, and authorized Jon's placement with Grandparents. Additionally, the trial court granted Grandparents "concurrent authorization" with NHCDSS to consent to "all medical, psychological, and educational testing, treatment and evaluation required" for Jon. The trial court then ordered Respondent-Father to comply with his Family Services Agreement by submitting to paternity testing, completing a comprehensive clinical assessment, completing a psychological evaluation, submitting to random hair and urine drug

screens, maintaining stable housing and income, and signing releases for the sharing of such information.

On 7 April 2021, NHCDSS submitted a report to the New Hanover District Court, noting "[p]aternity has not been established with [Respondent-Father] and [NHCDSS] has not been able to reach him since the last hearing regarding this matter, case planning, or visitation." After holding a review hearing, the court found that Respondent-Father "has maintained that he wants to wait until paternity is established to enter into a case plan with [NHCDSS]. However, he remains uncooperative in submitting to DNA testing as arranged by [NHCDSS] through Labcorp as he had previously paid for services with a different facility[,]" and Respondent-Father "has not visited with the Juvenile and has stated he does not wish to visit until paternity is established." In May 2021—approximately seven months after ordered—Respondent-Father was tested and found to be the biological father of Jon.

On 12 November 2021, the trial court held an initial permanency planning hearing. After the hearing, the trial court entered an order (the "Initial Permanency Planning Order") finding that Jon "continue[d] to do very well in the care of his [Grandparents,]" and that Respondent-Father started consistently attending visitations after he learned he was the biological father of Jon, but during these visitations, he was "somewhat uninvolved in [Jon's] care while there, i.e. feeding, changing diapers, etc. and that [Respondent-Father] requests the caretakers to do

these things even when he is there." The trial court further found that "[w]hile Respondent-Father has recently become actively engaged, he squandered the first two years of [Jon's] life by failing to build and sustain a relationship with him during that time." Ultimately, the trial court ordered legal custody of Jon to remain with NHCDSS and placement to remain with Grandparents. The trial court also adopted a primary permanent plan of adoption for Jon with a concurrent plan of reunification with a parent.

On 10 February 2022, the trial court held a permanency planning hearing and entered an order on 28 February 2022 finding that Respondent-Father was making progress in his case plan and "has been actively involved since the establishment of paternity and will need to demonstrate that he can provide safe, appropriate care for [Jon] independently." The trial court then changed the primary plan to reunification with a parent, with a secondary plan of adoption. Subsequently, venue was transferred to Moore County, where all the parties reside.

After the matter was transferred to Moore County, Moore County Department of Social Services ("MCDSS") began working with the family toward the primary permanent plan of reunification and a concurrent plan of custody with a relative. Before the Moore County District Court held its first permanency planning hearing, Grandparents retained counsel and filed a Motion to Intervene in Moore County on 21 May 2022. On 6 July 2022, over Respondent-Father's objection, the trial court entered an order allowing Grandparents to intervene because they, as caretakers of

Jon, "have assumed the status and obligation of parent since October 7, 2020[,] and should, properly, have been joined at the beginning of this action when filed in New Hanover County."

This matter came on for hearing multiple times,[3] in which the following persons testified: the New Hanover County Guardian ad Litem ("GAL") for Jon, Robert Van Damm; the Moore County Foster Care Social Worker, Shalonda Johnson; the mother of Respondent-Father's older son, Heather Odom; Respondent-Father; the Moore County GAL for Jon, Joanie Wilson; a CarolinaDNA medical officer, Michael Tew; and an expert witness in forensic toxicology, Dr. Andrew Ewans.

On 20 September 2024, the trial court entered a permanency planning order (the "Permanency Planning Order"), making 447 findings of fact "[b]ased upon clear, cogent, and convincing [evidence]," and concluding Respondent-Father waived his "paramount constitutional rights to care, custody and control of [his] child[,]" because "he has acted inconsistently with his constitutionally protected status due to his cumulative conduct, reviewing both his past and present conduct, and how it impacted" Jon, and the "efforts to reunite [Jon] with either parent clearly would be unsuccessful or inconsistent with the child's health or safety and need for a safe, permanent home within a reasonable period of time." The trial court ultimately

---

[3] Specifically, the trial court held hearings on 15 December 2022, 12 January 2023, 9 March 2023, 11 May 2023, 10 August 2023, 21 September 2023, 9 November 2023, 25 January 2024, 7 March 2024, and 27 June 2024.

ceased reunification efforts, ceased plan reviews, and granted guardianship to Grandparents. Respondent-Father timely appealed.

## II. Jurisdiction

As an initial matter, we address our jurisdiction over Respondent-Father's appeal. On appeal, Respondent-Father asks this Court to review the Permanency Planning Order that changed the custody of Jon. Respondent-Father, however, also raises two issues concerning two interlocutory orders: first, whether the trial court erred by entering an interlocutory order that allowed Grandparents to intervene (the "Intervention Order"); and second, whether the trial court erred by entering an interlocutory order that denied Respondent-Father's motion to recuse the trial judge (the "Recusal Order").

This Court has jurisdiction over Respondent-Father's appeal from a permanency planning order "that changes legal custody of a juvenile" pursuant to N.C.G.S. § 7B-1001(a)(4) (2023). Respondent-Father gained the right to appeal from the two interlocutory orders once the trial court entered the Permanency Planning Order. *See* N.C.G.S. § 1-278 (2023) ("Upon an appeal from a judgment, the court may review any intermediate order involving the merits and necessarily affecting the judgment."). Rule 3 of the Rules of Appellate Procedure, however, requires a notice of appeal to specifically "designate the judgment or order from which appeal is taken[.]" N.C. R. App. P. 3(d); *see Chee v. Estes*, 117 N.C. App. 450, 452 (1994) ("As a general rule, the appellate court obtains jurisdiction only over the rulings specifically

designated in the notice of appeal as the ones from which the appeal is being taken."). Thus, "in order to properly appeal an interlocutory order, an appellant must designate *both* the interlocutory order and the final judgment rendering the interlocutory order reviewable in its notice of appeal[.]" *See Manley v. Maple Grove Nursing Home*, 267 N.C. App. 37, 41 (2019) (emphasis added).

Here, Respondent-Father concedes he did not specifically designate the interlocutory orders in his notice of appeal, but argues this Court has jurisdiction to review the interlocutory orders under N.C.G.S. § 1-278. In the alternative, Respondent-Father requests this Court to exercise its discretionary appellate jurisdiction pursuant to N.C. R. App. P. 21(a) (2023).

Under N.C.G.S. § 1-278, this Court "may obtain jurisdiction to review an order not included in a notice on appeal." *Dixon v. Hill*, 174 N.C. App. 252, 257 (2005). "Review under N.C.G.S. § 1-278 is permissible if three conditions are met: (1) the appellant must have timely objected to the order; (2) the order must be interlocutory and not immediately appealable; and (3) the order must have involved the merits and necessarily affected the judgment." *Theuerkorn v. Heller*, 918 S.E.2d 681, 693 (N.C. Ct. App. 2025) (citation omitted); *see also Chahdi v. Mack*, 288 N.C. App. 520, 528 (2023) (holding the appellant's claims were not properly before this Court because the appellant failed to designate two interlocutory orders in his notice of appeal and "made no effort" to assert grounds for appellate review under N.C.G.S. § 1-278). As to the first requirement of timely objecting, the appellant does not need to make a

formal objection:

> With respect to . . . an interlocutory order, a trial ruling, or another order of the court not directed to the admissibility of evidence, formal objections and exceptions are unnecessary. In order to preserve an objection to the ruling or order or to the court's failure to make the ruling or order, it is sufficient if a party, at the time the ruling or order is made or sought, makes known to the court the party's objection to the action of the court or makes known the action that the party desires the court to take and the party's grounds for its position.

N.C. R. Civ. P. 46(b) (2023). As to the second requirement, "[a]n interlocutory order is one that does not determine the issues, but directs some further proceeding preliminary to a final decree." *Brewer v. Brewer*, 139 N.C. App. 222, 227 (2000) (citation omitted). As to the third requirement, "our Courts have found an interlocutory order to involve the merits and necessarily affect the judgment where the order deprived an appellant of one of [his] substantive legal claims." *Yorke v. Novant Health, Inc.*, 192 N.C. App. 340, 349–50 (2008).

Here, Respondent-Father successfully meets the first and second requirements under N.C.G.S. § 1-278 but fails to meet the third requirement—that the interlocutory orders involve the merits and deprive him of a substantive legal claim. First, as the trial court noted, counsel for Respondent-Father timely objected to the Intervention Order. Moreover, although not a formal objection, Respondent-Father sufficiently preserved his objection to the Recusal Order by filing a motion to recuse the presiding trial judge, "mak[ing] known the action that [Respondent-Father]

desire[d] the court to take and [his] grounds for its position." *See* N.C. R. Civ. P. 46(b); *see also Inman v. Inman*, 136 N.C. App. 707, 712 (2000) ("The motion made clear what action [the] plaintiff wanted the trial court to take and the grounds for that action. Therefore, . . . the plaintiff was not required to formally object or except to the order of the trial court which partially denied his motion to dismiss."). Second, both of the orders—the Intervention Order and the Recusal Order—are interlocutory orders. *See City of Raleigh v. Edwards*, 234 N.C. 528, 530 (1951) ("[A]n order granting a motion to intervene is not appealable."); *Wood v. City of Fayetteville*, 35 N.C. App. 738, 740 (1978) ("[O]rdinarily no appeal will lie from an order permitting intervention of parties unless the order adversely affects a substantial right which the appellant may lose if not granted an appeal before final judgment."); *see also Lowder v. All Star Mills, Inc.*, 60 N.C. App. 699, 702 (1983) ("A ruling on a motion to recuse a trial judge is an interlocutory order and is not immediately appealable.").

Respondent-Father, however, fails to show how the interlocutory orders involve the merits and necessarily affect the judgment by depriving him of one of his substantive legal claims. Rather, Respondent-Father asserts the Intervention Order "necessarily involved the merits and affected the judgment" by "adding an adversary in an already overmatched proceeding[]" and effectively "recognized [Grandparents] as attaining parental status on par with custodians[.]" Indeed, while adding an adversary may have, as Respondent-Father contends, "plac[ed] an additional burden on [him,]" the Intervention Order did not deprive Respondent-Father the right to

assert his legal claims. *See Yorke*, 192 N.C. App. at 349–50 (holding the appellant failed to meet the third requirement under N.C.G.S. § 1-278 because the trial court's interlocutory order did not deny the plaintiff his right to pursue his claim, nor did it "resolve any substantive legal issues related to" his claim). Moreover, our review of the Record does not indicate whether the Recusal Order deprived Respondent-Father of any substantive legal claims. *See id.* As such, we conclude the Intervention Order and the Recusal Order are not appealable interlocutory orders pursuant to N.C.G.S. § 1-278. *See id.*

As mentioned, Respondent-Father alternatively submits a petition for writ of certiorari ("PWC"), requesting this Court to review the interlocutory orders. Respondent-Father, however, has failed to show why issuing a writ of certiorari would be appropriate in these circumstances.

"[I]n appropriate circumstances[,]" this Court may issue a writ of certiorari "to permit review of the judgments and orders of trial tribunals when the right to prosecute an appeal has been lost[.]" N.C. R. App. P. 21(a)(1) (2023). A writ of certiorari is "an extraordinary remedial writ" that is intended "to correct errors of law." *Cryan v. Nat'l Council of YMCAs of the U.S.*, 384 N.C. 569, 572 (2023). "A writ of certiorari[, however,] is not intended as a substitute for a notice of appeal." *State v. Bishop*, 255 N.C. App. 767, 769 (2017). Thus, when the appellant petitions this Court for a writ of certiorari, the appellant has the burden to show (1) "merit or that error was probably committed below," and (2) "extraordinary circumstances" justify

the issuance of the writ. *Cryan,* 384 N.C. at 572. "There is no fixed list of 'extraordinary circumstances' that warrant certiorari review, but this factor generally requires a showing of substantial harm, considerable waste of judicial resources, or 'wide-reaching issuances of justice and liberty at stake.'" *Id.* at 573 (citation omitted).

Here, Respondent-Father filed a PWC, but failed to argue—let alone show—why issuing a writ of certiorari would be appropriate. Indeed, in his PWC, Respondent-Father argues this Court has jurisdiction under N.C.G.S. § 1-278 and requests that we grant review of the interlocutory orders, but he does not mention that this case has "merit or that error was probably committed below." Moreover, even if Respondent-Father did show merit, he nonetheless failed to explain why this case involves extraordinary circumstances that justify issuing a writ of certiorari. As such, in our discretion, we deny Respondent-Father's PWC.

Therefore, our review is limited to reviewing the Permanency Planning Order that changed the custody of Jon.

### III.  Analysis

On appeal, Respondent-Father argues the trial court erred by concluding he "waived or ceded his constitutionally protected paramount parental status." Specifically, Respondent-Father challenges 36 of the trial court's 447 factual findings and asserts "the cumulative weight of the findings [does] not support the conclusion that [Respondent-]Father ceded his right to parent Jon." We disagree.

"At a permanency planning hearing, the court may set guardianship as the juvenile's permanent plan and appoint a guardian for the juvenile if the court finds that doing so is in the juvenile's best interests." *In re J.R.*, 279 N.C. App. 352, 359 (2021) (citing N.C.G.S. §§ 7B-906.2(a)(3) (2020); 7B-600(a) (2020)). "Prior to granting guardianship of a child to a nonparent, a district court must clearly address whether the respondent is unfit as a parent or if his conduct has been inconsistent with his constitutionally protected status as a parent." *In re R.P.*, 252 N.C. App. 301, 304 (2017) (citation modified).

It is well established that "natural parents have a constitutionally protected interest in the companionship, custody, care, and control of their children." *Price v. Howard,* 346 N.C. 68, 72 (1997). The Due Process Clause of the Fourteenth Amendment "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children[,]" *Troxel v. Granville*, 530 U.S. 57, 66 (2000), and "ensures that the government does not impermissibly infringe upon a natural parent's paramount right to custody solely to obtain a better result for the child[,]" *Owenby v. Young*, 357 N.C. 142, 148 (2003). "[T]he law presumes parents will perform their obligations to their children," *In re Hughes*, 254 N.C. 434, 436 (1961); that parents will "act in the best interest of the child[,]" *Price*, 346 N.C. at 79; and that "the parents, not the State, [] know what those best interests are[,]" *Happel v. Guilford Cnty. Bd. of Educ.*, 387 N.C. 186, 195 (2025). Due to "the strength and importance of the parents' constitutionally protected interests, those interests must

- 13 -

prevail against a third party unless the court finds that the parents are unfit or have neglected the welfare of their children." *Price*, 346 N.C. at 73.

"[U]nfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy[; however,] other behavior can also rise to this level which must be considered on a case-by-case basis." *Rodriguez v. Rodriguez*, 211 N.C. App. 267, 277 (2011) (citation modified); *see also Price*, 346 N.C. at 83–84 ("[T]he parent should avoid conduct inconsistent with the protected parental interests. Such conduct would, of course, need to be viewed on a case-by-case basis, but may include failure to maintain personal contact with the child or failure to resume custody when able."). While "there is no bright line beyond which a parent's conduct meets this standard[,]" *Boseman v. Jarrell*, 364 N.C. 537, 549 (2010), "the [parent's] acts are not required to be 'bad acts' that would endanger the children[,]" *Heatzig v. MacLean*, 191 N.C. App. 451, 455 (2008) (emphasis omitted). Our Supreme Court has found that a parent's willingness to leave a child in the care of a third party can constitute conduct inconsistent with the parent's parental interest. *See Price*, 346 N.C. at 84.

"[A] trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63 (2001). "Our inquiry as a reviewing court is whether the evidence presented is such that a [fact-finder] applying that evidentiary standard could reasonably find the fact in question." *In re A.C.*, 247 N.C.

App. 528, 533 (2016) (alteration in original) (citations and internal quotation marks omitted). Nonetheless, "[t]he trial court's findings of fact are conclusive on appeal if unchallenged or if supported by competent evidence in the record." *In re I.K.*, 377 N.C. 417, 422 (2021) (citation modified); *see also Owenby*, 357 N.C. at 147 ("In a custody proceeding, the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary."). "The trial court's legal conclusion that a parent acted inconsistently with his constitutionally protected status as a parent is reviewed de novo to determine whether the findings of fact cumulatively support the conclusion and whether the conclusion is supported by clear and convincing evidence." *In re I.K.*, 377 N.C. at 421. "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Kassel v. Rienth*, 289 N.C. App. 173, 183 (2023) (citation and internal quotation marks omitted).

## A. Challenged Findings of Fact

In the present case, Respondent-Father challenges thirty-six findings of fact, arguing such factual findings (1) "lacked support of clear and convincing evidence[,]" (2) amounted to improper reweighing of factual issues, (3) failed to resolve conflicts in the evidence, or (4) were irrelevant in determining whether Respondent-Father forfeited his constitutional parental status. Overall, Respondent-Father contends the cumulative weight of these findings does not support the trial court's conclusion that Respondent-Father waived his parental status. We disagree.

### 1. Sufficiency of the Evidence

Respondent-Father first challenges Findings of Fact 255, 256, and 415, claiming these findings are not supported by "clear and convincing evidence." These three findings of fact address Respondent-Father's testimony about his past relationship with Jon:

> 255. That [Respondent-Father] would not get involved with DSS until "he knew [Jon] was" his. [Respondent-Father] believes that he was there "every step of the way" since that time. However, [Respondent-Father] has failed to pay a reasonable portion of the cost of care of the juvenile in that he has only been paying any child support since February 1, 2023. Prior to that time, he did not pay any support of any kind for his child.
>
> 256. That [Respondent-Father] testifies that he "did this for his kid" from the time the DNA test proved him to be the father. However, [Respondent-Father] did nothing other than buy clothing for the juvenile prior to that point. [Respondent-Father] made passing efforts to the placement provider, but never demonstrated a commitment and serious ability to provide for his child by taking away affirmative actions to provide for him.
>
> . . . .
>
> 415. That [Respondent-Father] has ceded parental authority to [Grandparents] by failing to even attempt to exercise parental authority and control over the juvenile.

Findings of Fact 255, 256, and 415 are supported by the evidence. Specifically, Finding of Fact 255 is supported by Respondent-Father's testimony that he told NHCDSS he "wanted to make sure he was [his]" before doing "anything with [Jon,]" and that he has "been there every step of the way since" learning that Jon was his.

Additionally, consistent with Respondent-Father's testimony, MCDSS admitted into evidence a report detailing Respondent-Father's child support payment history, which indicates that as of 26 April 2023, Respondent-Father had made three child support payments—the earliest payment date being 1 February 2023.

Similarly, Respondent-Father's testimony supports Finding of Fact 256, as he testified he "bought clothing for [Jon,]" and would "rather pay no child support and take care of [his] kids" by purchasing clothes and shoes for his kids. Finding of Fact 256 is also supported by Grandmother's testimony describing how Respondent-Father "would bring some toys" for the first few visitations and would buy clothes for birthday and Christmas gifts, but "[o]ther than that, there's not been any clothing purchases or anything like that[,]" and Respondent-Father "has only asked for [Jon] three additional times since [Grandparents have] had" Jon: "[t]wo of them being for Christmas" and the other time was when they had a birthday party for Respondent-Father's older son in January 2023. While there may have been evidence contrary to Grandmother's testimony, the trial court found Grandmother's testimony "credible, reliable, necessary and relevant[,]" and this Court is without the authority to reweigh the evidence and determine the credibility of each testimony. *See In re A.U.D.*, 373 N.C. 3, 12 (2019) ("To be sure, evidence existed that would have supported a contrary decision. But this Court lacks the authority to reweigh the evidence that was before the trial court.").

Finding of Fact 415 is supported by the trial court's judicial notice of the Initial

Permanency Planning Order, which included the following, relevant findings of fact: Respondent-Father stipulated he "had very minimal involvement with [Jon]"; Respondent-Father "squandered the first two years of [Jon's] life by failing to build and sustain a relationship with him during that time"; Respondent-Father "steadfastly refused to comply with the October 28, 2020 Order for Paternity Testing"; and Respondent-Father requested Grandparents feed and change Jon's diapers during visitations. Moreover, Grandmother testified that Respondent-Father did not play any role in Jon's life prior to August 2021, and out of approximately thirty-seven doctors' appointments, Respondent-Father only appeared at five.

As such, Findings of Fact 255, 256, and 415 are supported by the competent evidence in the Record and are, therefore, conclusive on appeal. *See In re I.K.*, 377 N.C. at 422; *see also Owenby*, 357 N.C. at 147.

### 2. *Reweighing of Factual Issues*

Respondent-Father next challenges Findings of Fact 101, 103, 104, 106, 107, 109, 110, 112, and 113, arguing the trial court improperly reweighed factual issues previously resolved by the New Hanover County District Court. These nine factual findings describe GAL Van Damm's testimony about Respondent-Father's past cooperation with the New Hanover County GAL program:

> 101. That [Respondent-Father] was not cooperative with the GAL program when the case was in New Hanover County.
>
> . . . .

103. That [Van Damm]'s written recommendations to the New Hanover Court prior to the case being transferred was that custody of the juvenile should be given to the caretakers, [Grandparents].

104. That [Van Damm] denies having written the report that was entered into evidence in New Hanover in February 2022.

. . . .

106. That [Van Damm] did not testify in court in February 2022 in New Hanover County. [Van Damm] understands that the order entered from that hearing found that [Respondent-Father] was cooperative with the GAL program, however, [Van Damm] disagrees with the finding of fact and testified that [Respondent-Father] was never cooperative with him.

107. That [Van Damm] states the order itself does not reflect what he personally felt should occur with the juvenile. He believes he was misrepresented.

. . . .

109. That [Van Damm] was told by his supervisor that the only way the case could be transferred to Moore County was if the recommendations changed back to reunification.

110. That [Van Damm] wanted to testify in Moore County due to his belief that he was silenced in New Hanover County and unable to submit the report he had intended or testify.

. . . .

112. That [Van Damm] did not believe [Respondent-Father] appeared to be making any efforts toward reunification while the case was in New Hanover County, which amounted to the first year of the juvenile's life.

113. That [Respondent-Father] did not make any effort to

be involved with the juvenile or the GAL program.

Respondent-Father contends these nine findings contradict twelve factual findings in New Hanover District Court's permanency planning order entered on 28 February 2022. Respondent-Father relies on *Kelly v. Kelly*, 167 N.C. App. 437 (2004), for the proposition that "one superior court may not modify, overrule or change the judgment of another superior court judge previously made in the same action."

In *Kelly*, Judge Fred M. Morelock entered an equitable distribution order allowing the defendant a credit; neither party appealed. *Id.* at 442–43. After Judge Morelock entered the equitable distribution order, he entered another order denying the plaintiff's claim for alimony and attorney's fees; the plaintiff appealed this order. *Id.* at 443. On appeal, this Court reversed and remanded the order denying permanent alimony and attorney's fees. *Id.* On remand to the trial court, a new judge, Judge Monica M. Bousman, conducted a hearing for additional findings, entered further findings based on the hearing and Judge Morelock's equitable distribution order, and denied the plaintiff's request for attorney's fees. *Id.* at 440. The plaintiff appealed again, arguing, *inter alia*, there was no evidence to support the trial court's calculation of the defendant's net income. *Id.* at 442. In rejecting this argument, we noted the trial court's calculation was supported by the equitable distribution order, "which was entered by another district court judge and not appealed." *Id.* at 443. We then recounted the well-settled rule regarding the binding effect of an order that is not appealed:

> When an order is not appealed, it becomes[] the law of the case, and other district judges were without authority to enter orders to the contrary. It is well established that no appeal lies from one superior court judge to another and that ordinarily one superior court judge may not modify, overrule or change the judgment of another superior court judge previously made in the same action.

*Id.* (citation omitted). Since neither party had appealed the equitable distribution order, we concluded the findings of fact were binding and thus held the trial court properly relied on the findings in the equitable distribution order. *Id.*

Here, we agree with Respondent-Father that Findings of Fact 101 and 113 should be disregarded because they contradict the factual findings in the New Hanover District Court permanency planning order.[4] *See id.*; *see also Hayden v. Hayden*, 178 N.C. 259, 263 (1919) ("This decree was not appealed from, and is therefore valid and binding in every respect."). The remaining seven factual findings, however, do not materially contradict any of the factual findings in the New Hanover Court permanency planning order entered on 28 February 2022 because they were based on Van Damm's testimony at the 15 December 2022 hearing. *See* N.C.G.S. § 7B-906.1(c) (2023) ("The court may consider any evidence, including hearsay evidence

---

[4] Specifically, Finding of Fact 101 in the Permanency Planning Order contradicts Finding of Fact 36 in the New Hanover District Court permanency planning order entered on 28 February 2022, which states that "Respondent-Father is actively participating in the plan of reunification and cooperating with the Department and the Guardian ad Litem for the Juvenile." Finding of Fact 113 in the Permanency Planning Order contradicts Finding of Fact 29 in the New Hanover District Court permanency planning order entered on 28 February 2022, which states, in relevant part, "Respondent-Father has been actively involved since the establishment of paternity and will need to demonstrate that he can provide safe, appropriate care for the Juvenile independently."

as defined in [N.C.]G.S. [§] 8C-1, Rule 801, or testimony or evidence from any person that is not a party, that the court finds to be relevant, reliable, and necessary to determine the needs of the juvenile and the most appropriate disposition."). Specifically, Findings of Fact 103, 104, 106, 107, 109, 110, and 112, are supported by Van Damm's testimony that his "written recommendation was that custody be given to [Grandparents]"; he attended the hearing in February 2022, but did not testify; he "had initially recommended in [his] report that the plan be custody be given to [Grandparents], but [he] was told that the only way that they would be able to transfer the case to Moore County would be to change that to reunification"; he believed he was "misrepresented" in the court order; he "was told by [his] supervisor that [the report] had to be changed, and it was changed before it was submitted to the Court"; he did not sign "the changed one"; it was "the God's honest truth that there was little to no involvement between" him and Respondent-Father; and it appeared to him that Respondent-Father was not, "in any meaningful way[,] trying to be involved with his child[.]" To the extent that the findings in the New Hanover District Court permanency planning order entered on 28 February 2022 contradicted Van Damm's testimony, the trial court had the "duty to consider and weigh all the competent evidence before [it,]" pass upon the credibility of the witnesses, and determine "the reasonable inferences to be drawn therefrom[,]" *see Knutton v. Cofield*, 273 N.C. 355, 359 (1968), and "this Court lacks the authority to reweigh the evidence that was before the trial court[,]" *see In re J.O.D.*, 374 N.C. 797, 806 (2020) (citation

omitted). Therefore, because these factual findings were supported by competent evidence in the Record and because the trial court had the authority to weigh all competent evidence before it, these factual findings are binding on appeal. *See In re I.K.*, 377 N.C. at 422; *see also Owenby*, 357 N.C. at 147.

### 3. *Failed to Resolve Conflicts in the Evidence*

Respondent-Father next challenges Findings of Fact 156, 157, 189, 198, 383, 387, 390, 395, 397, and 398, asserting these findings failed to resolve conflicts in the evidence. These ten findings pertain to the 12 April 2022 and 31 August 2023 drug screenings to which Respondent-Father submitted—both of which yielded positive drug use. The Findings of Fact state, in relevant part:

> 156. That from the August 31, 2023 collection, [Respondent-Father]'s hair results were positive for amphetamines, oxycodone, hydrocodone and methamphetamine. . . . .
>
> 157. That [Respondent-Father] was tested using a Hair Stat 14 panel which includes a more comprehensive opioid panel than the 8 panel. . . . . Both the 8 panel and 14 panel test for amphetamine and methamphetamine.
>
> . . . .
>
> 189. That [Respondent-Father]'s hair screen was positive for multiple substances, including the opioids for which he has a prescription. However, he was also positive for methamphetamine and amphetamine. . . . .
>
> . . . .
>
> 198. That MCDSS believes that [Respondent-Father] has acted inconsistently with the health and safety of the juvenile and therefore it is in the best interest of the

juvenile to be in guardianship with [Grandparents] due to [Respondent-Father]'s refusal to work with MCDSS or the GAL in child and family team meetings, in home visits, drug screening, his having tested positive for methamphetamine on two occasions and denying either using it or being exposed to it . . . .

. . . .

383. That Dr. Ewans could not account for the fact that even though [Respondent-Father] was self-admitting to using his prescribed opioids at the time of the October 4, 2023 collection . . . that test came back negative for all substances including opioids.

. . . .

387. That Dr. Ewans chose not to review the extensive amount of information obtained through the litigation packets released to both MCDSS hair drug screens obtained from [Respondent-Father] that were positive for methamphetamine prior to the November 9, 2023 hearing. . . . .

. . . .

390. That at no time did Dr. Ewans consider the way the various collections were obtained . . . . Instead, Dr. Ewans appears to have a personal vendetta against [] Tew and Carolina DNA accusing him, without any facts, basis , or motive, of doctoring the collections taken from [Respondent-Father]. Dr. Ewans'[s] only conclusion is that the third-party company contracted by MCDSS to take the collections (Mr. Michael Tew) intentionally switched samples on two occasions in an effort to make [Respondent-Father] test positive for methamphetamine.

. . . .

395. That Dr. Ewans had no answer as to why [Respondent-Father] did not test positive for opioids despite being prescribed opioids and having testified that

he is actively taking them. Dr. Ewans stated that they can sometimes be excluded if prescribed but there is nothing on any testing records indicating anything was excluded.

. . . .

397. That th[e c]ourt finds the conclusion drawn by Dr. Ewans poorly investigated, entirely implausible and wholly without merit.

398. That the [c]ourt did not find Dr. Ewans testimony, or the evidence entered during his testimony, as relevant, reliable or necessary in this matter. That as an expert in forensic toxicology his testimony was immaterial to this case.

Respondent-Father relies on *In re Gleisner*, 141 N.C. App. 475 (2000), to argue there is "uncontradicted evidence that the test administered was insufficient to determine whether [Respondent-]Father had used an illegal substance" and that these factual findings "should not be considered as evidence that he used methamphetamine or any other illegal substance or that he acted inconsistently with his parental rights."

In *In re Gleisner*, the trial court found the respondent's son and daughter were neglected and ordered placement of the respondent's son "with his maternal great aunt and uncle, with [the] petitioner retaining legal custody, and further ordered physical and legal custody of [the respondent's daughter] to remain with [the] petitioner for future placement." *Id.* at 478. On appeal, the respondent challenged the evidence, but this Court was unable to conduct a proper appellate review because the factual findings were "simply a recitation of the evidence presented at trial, rather than ultimate findings of fact." *Id.* at 480. In reviewing the "findings of fact[,]" we

explained that "[i]f different inferences may be drawn from the evidence, the trial judge must determine which inferences shall be drawn and which shall be rejected[,]" and "[w]here there is directly conflicting evidence on key issues, it is especially crucial that the trial court make its own determination as to what pertinent facts are actually established by the evidence, rather than merely reciting what the evidence may tend to show." *Id.* We held that "[i]n a nonjury trial, it is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony[,]" and the failure to resolve the disputed issues deprived this Court of the ability to conduct a proper review. *Id.*

Unlike the respondent's argument in *In re Gleisner*, however, Respondent-Father's argument here fails to acknowledge the trial court's role as both "judge and jury[,]" *see In re A.D.*, 278 N.C. App. 637, 641 (2021) (citation omitted), and its duty to weigh all the evidence and determine the credibility of the witnesses, *see In re Gleisner*, 141 N.C. App. at 480. While Respondent-Father claims there is uncontradicted evidence that the test administered was sufficient, Respondent-Father fails to acknowledge—let alone challenge—the trial court's findings of fact that resolve this conflict. Specifically, the trial court heard testimony from Tew and made the following, relevant factual findings:

> 359. That [] Tew sends his samples to LabCorp using FedEx immediately upon completion of the testing. He does not retain any samples in his possession.
>
> 360. That LabCorp will refuse to process a test if there is

anything defective or out of the ordinary in his testing kits. Their reports are high quality and easily understood by laymen to include his clients.

. . . .

364. That [] Tew obtained litigation packets for both screens which show in great detail the confirmation testing the occurred with both samples. The litigation packets also include details about the testing itself. These were obtained at the request of the [R]espondent-[F]ather's expert witness, Dr. Andy Ewans, PhD, who decided not to analyze them after obtaining them.

. . . .

367. That MCDSS did not inappropriately rely on any "interpretation" of the drug screen results. The facts gleaned from the written reports obtained by CarolinaDNA after analysis by LabCorp indicate positive or negative results as well as a numerical value attached to the positive or negative results. . . . .

368. That [] Tew is considered by the [c]ourt to be a relevant, reliable, necessary and credible witness.

Moreover, Respondent-Father fails to challenge Findings of Fact 158-165, which describe Respondent-Father's surprise to the positive drug screen, his denial of ever using methamphetamine, his request for another retest drug screen but later refusing to submit to the retest, and his own drug screening at an undisclosed location and that "did not show positive for the drugs he was prescribed, including oxycodone."

Since these findings of fact remain unchallenged, they are binding on appeal. *See In re I.K.*, 377 N.C. at 422. A careful reading of the trial court's findings of fact reveals that the findings of fact are more than mere recitations of the evidence;

rather, they show what evidence the trial court considered to determine the "credibility of the witnesses and the weight to be given their testimony." *See In re Gleisner*, 141 N.C. App. at 480. As such, "we decline to disregard the essential import" of Findings of Fact 156, 157, 189, 198, 383, 387, 390, 395, 397, and 398. *See In re A.C.*, 378 N.C. 377, 385 (2021) (rejecting the respondent's argument that certain factual findings were mere recitations of the evidence because when read together, it was evident that "the trial court was simply pointing to the portion of the record that provided the evidentiary support for" its factual findings).

### 4. *Irrelevant Considerations in Determining Respondent-Father's Unfitness*

Respondent-Father lastly challenges Findings of Fact 213, 214, 215, 216, 217, 218, 219, 220, 235, 236, 237, 257, 282, and 283, arguing "[s]ome findings might be relevant to a weighing of best interest but were improper as a basis for determining whether [Respondent-]Father had forfeited his paramount status as a parent."

When determining whether a natural parent has acted inconsistently with the constitutionally protected parental status, "the specific question to be answered in cases such as this one is: 'Did the legal parent act inconsistently with h[is] fundamental right to custody, care, and control of [his] child and [his] right to make decisions concerning the care, custody, and control of that child?'" *Estroff v. Chatterjee*, 190 N.C. App. 61, 69 (2008) (quoting *Mason v. Dwinnell*, 190 N.C. App. 209, 222 (2008)). In answering this question, the court should focus on:

> [W]hether the legal parent has voluntarily chosen to create a family unit and to cede to the third party a sufficiently significant amount of parental responsibility and decision-making authority to create a permanent parent-like relationship with his or her child. The parent's intentions regarding that relationship are necessarily relevant to that inquiry. By looking at both the legal parent's conduct and his or her intentions, we ensure that the situation is not one in which the third party has assumed a parent-like status on his or her own without that being the goal of the legal parent.

*Id.* at 70 (internal citation and quotation marks omitted). "[A] parent's socioeconomic status is not relevant to a determination of a parent's unfitness or acts inconsistent with a parent's constitutionally protected status." *Thomas v. Oxendine*, 280 N.C. App. 526, 539 (2021); *see also Jolly v. Queen*, 264 N.C. 711, 715 (1965) (holding a parent's socioeconomic status may be relevant to a determination of whose custody is in the best interests of the child, but is irrelevant in determining a parent's fitness); *Dunn v. Covington*, 272 N.C. App. 252, 265 (2020) ("While socioeconomic factors such as the quality of a parent's residence, job history, or other aspects of their financial situation would be relevant to the determination of whose custody is in the best interest of the child, those factors have no bearing on the question of fitness.").

Five of the factual findings Respondent-Father challenges here—Findings of Fact 235-37, 282, and 283—address Respondent-Father's testimony regarding his socioeconomic status:

> 235. That [Respondent-Father]'s income is not sufficient to provide for himself and the juvenile, but he does get other income from side jobs, a worker's compensation settlement

and Pell grants. Additionally, his mother assists with the housing costs.

236. That [Respondent-Father] only disclosed his monthly income in his child support payments, he did not include the income he receives from side jobs. [Respondent-Father] would not fully disclosed his income from his "side jobs" to the [c]ourt, to Child Support or MCDSS.

237. That [Respondent-Father] bought clothes, shows on toys for [Jon] and food during visitation. He has not provided any on-going in-kind support for [Jon] in the home where he is placed.

. . . .

282. That the amount of money [Respondent-Father] is making . . . is about what he owes each month in rent. He testified that when "his bills need to get paid, they get paid." He was in bankruptcy twice recently and has not disclosed any other regular sources of income. Part of [Respondent-Father]'s case plan included being able to financially care for [Jon,] however[,] he has not demonstrated an ability to do so.

283. That [Respondent-Father] testified under oath that he misled and incorrectly disclosed information on bankruptcy documents. [Respondent-Father]'s testimony as to his financial stability and ability to pay for the minimal needs of the juvenile are not credible.

Nine of the factual findings—Findings of Fact 213-20 and 259—pertain to an incident in which Respondent-Father's older son accidentally shot himself as a young child:

213. That in 2018 Ms. Odom was carrying a firearm in her purse when they left their home in Moore County and headed towards South Carolina.

214. . . . . Ms. Odom also discussed with [Respondent-

Father] on the car ride to South Carolina that she had her gun with her.

215. That neither Ms. Odom nor [Respondent-Father] had concealed carry permits for handguns.

216. That Ms. Odom and [Respondent-Father] had been smoking marijuana in the room prior to the incident in 2018.

217. That the decision was made by [Respondent-Father] and Ms. Odom to keep the gun loaded but put the gun in Ms. Odom's purse on a dresser behind the television in the hotel room . . . [Respondent-Father] did not receive a conviction related to this shooting.

218. That the police report form South Carolina state that [Respondent-Father] told law enforcement that he had no knowledge of the gun being in Ms. Odom's purse . . . [h]owever, Ms. Odom testified in [c]ourt that she and [Respondent-Father] discussed the gun and where it should be placed for safe keeping away from their son.

219. That [Respondent-Father's older son] found the gun and discharged it into his own head while [Respondent-Father] and Ms. Odom were in the same hotel room. [Respondent-Father's older son] has since recovered but has some lasting effects from the accident.

220. That should [Respondent-Father] have custody of [Jon], Ms. Odom anticipates being around and a part of [Jon]'s life.

. . . .

259. That [Respondent-Father] told Myrtle Beach Law Enforcement that he had no idea there was a firearm when he was driving with Ms. [] Odom. He stated on the stand that he was unable to remember details in 2018 and that Ms. Odom doesn't either.

Here, we agree with Respondent-Father that Findings of Fact 235-37, 282, and

283 have no bearing on the question of Respondent-Father's fitness because they directly relate to the socioeconomic status of Respondent-Father. *See Thomas*, 280 N.C. App. at 539; *Jolly*, 264 N.C. at 715; *Dunn*, 272 N.C. App. at 265. Moreover, in applying the principle in *Estroff* here, while the consideration of the incident where Respondent-Father's older son accidentally shot himself as a young child is relevant in an adjudication proceeding, such consideration is irrelevant in determining Respondent-Father's intentions regarding the relationship between Jon, Respondent-Father, and Grandparents. *See Estroff,* 190 N.C. App. at 70.

"[A]ny potential error" in considering Respondent-Father's socioeconomic status or the 2018 incident, however, is harmless error "where the remaining findings are sufficient to support the court's conclusion that [the respondent] acted inconsistently with [his] parental status[.]" *See Thomas*, 280 N.C. App. at 539 (holding that "any potential error" in considering the parent's socioeconomic status in determining the parent's unfitness was harmless error as "the remaining findings [were] sufficient to support the court's conclusion that [the respondent] acted inconsistently with her parental status"). As such, we disregard Findings of Fact 213-220, 235-237, 257, 282, and 283, and now turn to consider whether the remaining findings sufficiently support the trial court's legal conclusion that Respondent-Father acted inconsistently with his parental status. *See id.*

## B. Conclusions of Law

Respondent-Father argues that the findings of fact do not support the trial

court's conclusion of law that he acted inconsistently with his constitutionally protected parental status. We disagree.

In addition to the supported findings above, the trial court also found, "[b]ased upon clear, cogent, and convincing evidence," the following relevant Findings of Fact:

> 135. That beginning in April 2023, [Respondent-Father] began showing resistance to working with MCDSS. On April 24, 2023[,] [Respondent-Father] was not present [at] a scheduled home visit nor was he able to come to the MCDSS offices.
>
> . . . .
>
> 140. That [Respondent-Father] told SW Johnson that he wanted to be part of the juvenile's life since the juvenile was born and was making efforts since his birth to be part of his life. This was later proven to be false information given to her by [Respondent-Father].
>
> . . . .
>
> 144. That [Respondent-Father] was found in New Hanover County to have "squandered the first two years of the juvenile's life."
>
> . . . .
>
> 169. That [Respondent-Father] often misses scheduled events and SW Johnson has, on multiple occasions, suggested he buy a planner or calendar of some variety.
>
> . . . .
>
> 173. That on [Jon]'s birthday on September 17, 2023[,] [Respondent-Father] sent [Grandmother] a text message asking her to relay a "Happy Birthday" to [Jon]. When [Grandmother] asked him if he would like to do a video call, he never responded.

. . . .

178. That [Respondent-Father] was not involved in the physical abuse of the juvenile prior to the petition being filed. [Respondent-Father] made no effort to protect the juvenile or care for him until after May 2021.

. . . .

181. That [Respondent-Father], after delayed taking the court ordered paternity test for at least eight [] months and during that time did not enter a case plan nor did he seek to visit with the juvenile.

182. That [Respondent-Father] knew the test he took himself in February 2020 was inconclusive because he did not provide enough material. He then waited six [] months until August 2020 to present himself for another test.

183. That [Respondent-Father] refused to take the paternity test through NHCDSS unless and until NHCDSS reimbursed him for the paternity test he took on his own accord in August 2020 which was never completed.

184. That NHCDSS attempted to speak to [Respondent-Father] on multiple occasions about the paternity with no response from him. These dates include May 28, 2021, June 30, 2021 and July 30, 2021. They attempted to contact him via phone and text.

185. That even after the case came to Moore County, [Respondent-Father] never offered to pay for the care, feedings and housing of the juvenile beyond passing efforts to include one offer to pay for part of a birthday party that was already paid by [Grandparents].

. . . .

231. That [Respondent-Father] was aware of the birth of the juvenile at the time of the birth of the juvenile due to the posting of photographs on Facebook. [Respondent-Father] made no attempt to ascertain paternity at that

time.

. . . .

233. That it took approximately eight [] months after the non-secure custody order was signed and petition filed for him to comply with the court order to get tested for paternity of [Jon].

. . . .

238. That [Respondent-Father] did obtain items that he keeps in his own home for [Jon]'s use that did not contribute to his care and keeping during pendency of this case.

239. That [Respondent-Father] is willing to buy things for [Jon] but is reluctant to provide for him because [Jon] does not live with [Respondent-Father]. [Respondent-Father] relies on [Grandmother] to tell him what [Jon] may or may not need.

. . . .

241. That [Respondent-Father] feels restricted with what he is able to do with [Jon], however he is unwilling to engage in the activities necessary for [Jon] to be safely placed with [Respondent-Father]. [Respondent-Father] restricted all interaction between the GAL and MCDSS himself.

. . . .

243. That [Respondent-Father] was not willing to be a placement or engage in visitation with [Jon] until the DNA test was conclusive. [Respondent-Father] "steadfastly refused" to comply with the court ordered DNA testing.

. . . .

246. That [Respondent-Father] knew from the time [Mother] was pregnant that he could be the father of the child.

247. That [Respondent-Father] did not keep in contact with [Mother] during her pregnancy, nor did he follow up about the pregnancy despite knowing that she may be pregnant with his child.

248. That [Respondent-Father] first heard that the juvenile [Jon] was born via posting on Facebook. He did see that the child was black. He had been told that if the child was black, it was his.

249. That [Respondent-Father] waited 3-6 months to attempt DNA testing after the juvenile [Jon] was born. The results of that test were inconclusive due to an insufficiency of DNA sampling. [Respondent-Father] did not follow-up and give more DNA for the testing. [Respondent-Father] never attempted another test before the NHCDSS became involved.

. . . .

266. That [Respondent-Father] believes the grandparent's "job" is to look after their grandson. [Respondent-Father] believes [Grandparents] have done a "great job" looking after [Jon].

. . . .

268. That [Respondent-Father] testified that he has a lot of extra time on his hands. However, he has been unable to make scheduled appointments both for himself and [Jon]. This included missed drug screening.

. . . .

289. That the court finds [Respondent-Father]'s testimony not credible as to the facts and circumstances of his drug testing and disclosure to his treating physicians at the pain clinic.

. . . .

326. That Ms. Wilson does not see a bond between

[Respondent-Father] and the juvenile [Jon].

327. That Ms. Wilson has never seen [Respondent-Father] act in a caring or nurturing way with [Jon]. [Jon] does not go to [Respondent-Father] for comfort or guidance.

. . . .

332. That [Respondent-Father] has been uncooperative with the GAL Ms. Wilson when she has reached out to him to visit.

. . . .

337. That Ms. Wilson has observed that [Respondent-Father] does not have an understanding of [Jon]'s medical, or speech therapy as reported during the Child and Family Team meetings. He also did not ask any questions about the well-being needs of the child.

. . . .

409. That until August 2021 [Respondent-Father] did not have any interaction with the juvenile and had no role in his life.

. . . .

411. That since October 2020 [Grandparents] have been acting in lieu of the parents of the juvenile by making all medical, dental and educational decisions for the juvenile.

. . . .

414. That [Grandparents] have been the exclusive party bringing [Jon] to speech therapy, doctors' appointments, preschool, dentist appointments and the like. They always inform [Respondent-Father] of these appointments but he only rarely joins them. Of the 37 doctor's visits [Jon] has attended since August 2021, [Respondent-Father] has been to 5.

. . . .

417. That [Respondent-Father] does not attend [Jon]'s basketball games or practices despite being informed of them.

. . . .

436. That both parents have neglected the child's welfare and acted in a manner that is inconsistent with the child's health and safety.

Respondent-Father does not challenge these findings of fact; thus, they are binding on appeal. *See In re I.K.*, 377 N.C. at 422. These unchallenged findings of fact support the trial court's conclusions of law stating:

6. That by clear and convincing evidence both the respondent mother and the respondent father have waived their paramount constitutional rights to care, custody and control of their child.

. . . .

8. That [Respondent-Father] has waived his rights as he has acted inconsistently with his constitutionally protected status due to his cumulative conduct, reviewing both his past and present conduct, and how it impacted the child and that his ceding parental rights to a third party by not engaging in or even attempting to engage in the care, support and upbringing of the child outside of visitation. [Respondent-Father] has not made, nor attempted to make, decisions regarding the minor child's medical care, education or welfare, contributed financially to his support and maintenance in any significant way . . . or otherwise filled the role of parent of the minor child. . . .

Therefore, the trial court sufficiently supported its conclusion that Respondent-Father acted inconsistently with his constitutionally protected parental status. *See Price,* 346 N.C. at 79; *see also Owenby,* 357 N.C. at 145. Accordingly, we hold the trial

court did not err by concluding Respondent-Father has waived his parental status over Jon.

## IV.  Conclusion

Upon careful review, we conclude the trial court did not err in concluding Respondent-Father acted inconsistently with his paramount parental status, where the conclusion was supported by clear and convincing evidence. Further, we dismiss Respondent-Father's arguments regarding Grandparents' intervention and motion for recusal because Respondent-Father failed to properly preserve these issues for appeal.

AFFIRMED IN PART AND DISMISSED IN PART.

Judges GORE and FREEMAN concur.

Report per Rule 30(e).